FILED
United States Court of Appeals
Tenth Circuit

August 17, 2010

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JOSEPH LUNDSTROM; JANE
HIBNER,

          Plaintiffs-Appellants,

v.

ALBUQUERQUE POLICE
OFFICERS DEBRA ROMERO,
ANTHONY SEDLER, LORENZO
APODACA, EDOUARD TAYLOR,
ZAZZA GREEN, in their individual
capacities and as employees of the
City of Albuquerque,

          Defendants-Appellees.

No. 08-2254

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. NO. 1:07-CV-00759-JCH-WDS)**

---

Frances Crockett, Law Office of Frances Crockett, Albuquerque, New Mexico for
Appellants.

Stephanie M. Griffin, Assistant City Attorney, City of Albuquerque, New Mexico,
for Appellees Sedler, Apodaca, Taylor and Green (with Michael S. Jahner,
Yenson, Lynn, Allen & Wosick, P.C., Albuquerque, New Mexico, on the Joint
Brief, for Appellee Romero) for Appellees.

---

Before **KELLY**, **EBEL**, and **TYMKOVICH**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

This case arises from a confrontation at Joseph Lundstrom's home during a child welfare check by Albuquerque Police Department officers. The encounter resulted in the officers pulling weapons on Lundstrom and his girlfriend, Jane Hibner, ordering him from the home, and then leaving them handcuffed on the front sidewalk while officers searched the home. No child was found in the home.

Lundstrom and Hibner brought this suit under 42 U.S.C. § 1983 as a result of the encounter. The district court determined qualified immunity shielded the officers and granted their summary judgment motions.

On appeal, Lundstrom and Hibner argue qualified immunity does not protect the officers. We conclude Lundstrom and Hibner have alleged facts sufficient to demonstrate the officers violated their clearly established constitutional rights. We find that, while the circumstances the officers confronted initially supported a brief investigatory detention, objectively reasonable officers would not have prolonged the detention and searched the home on the facts before them. Accordingly, we hold the officers are not entitled to qualified immunity.

We therefore AFFIRM in part, REVERSE in part, and REMAND for further proceedings consistent with this opinion.

# I. Background

On the evening of August 19, 2006, a neighbor called 911 and reported she heard a woman at Lundstrom's residence "like beating [her] toddler, and [she's] got him outside in the rain and she's screaming at him that he can come in the house when he shuts the f*** up." App. at 47. The neighbor told the 911 operator she actually did not see anything but stated she could "hear the sound of [the woman's] hand striking [the child]" and his "screaming." *Id.* at 48. The neighbor informed the operator she had driven by Lundstrom's house in her "tall truck" in an attempt to observe the situation, but that she could not see into the backyard. *Id.* Based on the child's "high pitched baby scream," the neighbor estimated for the operator that the child was a "toddler or younger." *Id.* at 49. She left her telephone number with the operator.

Approximately 40 minutes later, around 9:30 p.m., Officer Debra Romero of the Albuquerque Police Department (APD), responding to the neighbor's call, arrived at Lundstrom's house. Officer Romero understood from dispatch that someone had reported hearing a child being slapped and crying outside, and there was a concern for the child's welfare. As Officer Romero approached the front door of Lundstrom's residence, she heard a high-pitched voice, but could not tell whether it was the voice of a child or an adult.

Officer Romero rang the door bell and Lundstrom answered the door. Lundstrom testified Officer Romero was in the foliage in the front yard when he

came to the door and that she shined her flashlight on him and inside his house. Officer Romero, who was in full uniform, identified herself as an APD officer and explained to Lundstrom that she was there to check on a child's welfare. According to Officer Romero, Lundstrom became hostile as soon as she told him why she was at his house. Lundstrom stated there was no child at his residence. Officer Romero replied she needed to enter Lundstrom's house to verify no child was in need of assistance. Officer Romero testified Lundstrom shouted "there [are] no f***ing kids here" and slammed the front door shut. *Id.* at 70. Lundstrom testified he neither yelled at Officer Romero nor closed the front door at this time.

Lundstrom testified he was suspicious Officer Romero was not an actual police officer and that her uniform and badge were fake. Lundstrom requested Officer Romero provide identification. She responded by pointing to her badge and reiterating that she was an APD officer. Lundstrom further testified Officer Romero also pulled her gun, pointed it at him, and demanded he show his hands after he requested identification from her. Officer Romero testified—differently—that she drew her weapon when Lundstrom reopened the front door because she was concerned he might be armed. At this point, Hibner, responding to Lundstrom's raised voice, went to the front door. She moved between Officer Romero and Lundstrom; Officer Romero's gun was pointed at her for a short time. When Lundstrom showed his hands to Officer Romero, she

-4-

determined he was holding a telephone, not a weapon, and lowered her gun. Hibner then left the residence while Lundstrom shut the front door and remained inside.

Officer Romero requested back-up units be sent to Lundstrom's house. Three officers responded to her request. When they arrived at the scene, they understood a disorderly subject had "barricaded" himself inside the house and that Officer Romero had originally been sent to Lundstrom's residence to check on a child's welfare. *Id.* at 81.

When the three officers arrived at Lundstrom's house, another officer, who had been dispatched there in response to a request by Lundstrom for a second officer, was already present. Lundstrom had called 911, asking for confirmation that Officer Romero was in fact a police officer and that additional officers be sent to his house.

Four officers positioned themselves in front of Lundstrom's residence. A fifth officer took a position in Lundstrom's backyard, either climbing the fence or opening a gate to gain access.

The 911 operator confirmed for Lundstrom that Officer Romero was an APD officer. For a time, Lundstrom remained unconvinced. During that time, the officers tried to persuade him to exit the house.

While this was happening, Hibner, who remained in front of Lundstrom's house, used the cordless telephone she was carrying to participate in Lundstrom's

call with 911. Hibner testified that, at this point, Officer Romero did not ask her any questions and did not respond to her attempts to initiate a conversation. The officers positioned in front of the house eventually directed Hibner to come to them. When Hibner complied, she was handcuffed, patted down, and directed to sit on the curb. According to Hibner, she was asked a number of questions but none relating to a child, until she mentioned her granddaughter. Hibner testified, "It seem[ed] like they weren't really interested in a . . . child." *Id.* at 358.

At some point after Hibner left the residence and Lundstrom closed the front door, one of the officers called dispatch, requesting that the information the neighbor reported be verified. Dispatch called the neighbor on the telephone. The neighbor told the dispatcher that, while she never saw anything, she heard an adult female—"definitely a female"—yelling at and striking a small child, "an infant or a toddler." Plaintiffs/Appellants Production to the Record as Requested by this Court, dated Sept. 24, 2009, Exhibit 1, at 50–51. The dispatcher and the neighbor engaged in the following dialogue:

> DISPATCH: Okay. There is no child there at [Lundstrom's residence]. It's two adults. It's a male and a female. So I need to know what you heard . . . .
>
> NEIGHBOR: Well, then it's the wrong address, because this was an infant and a female adult. But they only have that baby some of the time.
>
> DISPATCH: So, you're saying there was a small child there?
>
> NEIGHBOR: Yes.

*Id.* at 50. The neighbor also stated she was a retired San Diego police officer.

Dispatch advised the officers the neighbor was a retired San Diego police officer and that, while she did not see anything, she had "heard a female adult yelling at a small [child]." App. at 51. Beyond that, it is unclear how much of the dispatcher's conversation with the neighbor was heard by or relayed to the officers. Officer Romero testified she was never informed there was a possibility she was at the wrong residence and that, "[at] the time of the call, [based on the information given to her, she] was sure [she] was at the right residence." *Id.* at 73. But another of the officers testified "there was a dialogue on the telephone between 911 operators, our dispatcher, and the officers at the front door" and that "any time a dispatcher would get any information pertinent to [the situation], they would relay it over the radio to us." *Id.* at 83. In addition, Officer Romero acknowledged all of the officers had access to the same line of communication and could listen to the same radio.

From a position in the backyard, one officer observed Lundstrom pacing in a bedroom. He testified Lundstrom appeared upset, and reported his observations via radio to the other officers at the scene.

The 911 operator speaking with Lundstrom on the telephone ultimately transferred his call to dispatch. The dispatcher again confirmed for Lundstrom that the officers were actual APD officers: "I have four or five officers outside your home." *Id.* at 65. The dispatcher also directed Lundstrom to exit his house

and go to the officers, stating, "I need you to go outside" and "[those are] real officer[s] out there and they are going to point their gun[s] at you if you refuse to come out." *Id.* at 66. The dispatcher instructed Lundstrom "to put the phone down, open the door and . . . step out with [his] arms so that [the officers] can see them." *Id.* at 67. Lundstrom told the dispatcher, "if [the officers] beat the crap out of me, I'm fighting back." *Id.* Dispatch relayed Lundstrom's statement to the officers: "He's saying if [officers] do fight with him, he will fight back." *Id.* at 52.

Lundstrom eventually came out of his house. He walked out the front door with his hands up and in full view. Lundstrom testified the officers were pointing guns at him as he emerged from his residence. Lundstrom was handcuffed and patted down. Lundstrom testified he was pressed up against the back of a vehicle and then shoved to the ground. He also testified he felt an elbow or knee against the back of his head and that his arm was twisted and "rolled up onto [his] head." *Id.* at 93. According to Lundstrom and Hibner, as a result of this encounter with the officers, Lundstrom sustained various injuries, including a sore neck, scrapped knees, and a knot on the head.

After a short time, Lundstrom was placed in a police vehicle. He estimates he remained handcuffed in the vehicle for 30 to 45 minutes. During this time, some of the officers entered Lundstrom's house to search for other occupants and

interviewed Lundstrom and Hibner. No child was found. Hibner estimates the officers were in the house for 10 minutes.

The officers then removed Lundstrom's and Hibner's handcuffs and told them they were free to go. Lundstrom and Hibner were never charged with any crime. It is undisputed the officers operated without a warrant while engaged at Lundstrom's residence.

## II. Discussion

Lundstrom and Hibner contend the officers violated their clearly established constitutional rights in three ways: (1) seizing them without reasonable suspicion or probable cause; (2) using excessive force against Lundstrom; and (3) searching the house illegally. They also assert tort claims under state law for assault, battery, trespass, false arrest, and false imprisonment.

We discuss their claims in turn.

### A. Qualified Immunity

Before discussing the specifics of the claims, a brief outline of the applicable law will be helpful to keep in mind. We review a district court's decision to grant summary judgement "de novo, applying the same standard as the district court." *Thomas v. City of Blanchard*, 548 F.3d 1317, 1322 (10th Cir. 2008) (internal quotation marks omitted). At this stage, we view the evidence and draw reasonable inferences in the light most favorable to the nonmoving party. *See Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1223 (10th Cir. 2008). Summary

judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "An issue is genuine if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way" and "[a]n issue of fact is material if under the substantive law it is essential to the proper disposition of the claim." *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (internal quotation marks omitted).

When a defendant asserts qualified immunity at the summary judgment stage, the burden shifts to the plaintiff, who must clear two hurdles to defeat the defendant's motion. *See Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009). The plaintiff must demonstrate, on the facts alleged, that (1) the defendant violated a constitutional right, and (2) the right was clearly established at the time of the alleged unlawful activity. *See id.* We have the freedom to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009).

"A constitutional right is clearly established when, at the time of the alleged violation, the contours of the right were sufficiently clear that a reasonable official would understand that his actions violate that right." *Swanson v. Town of Mountain View*, 577 F.3d 1196, 1200 (10th Cir. 2009). A "plaintiff

must do more than identify in the abstract a clearly established right and allege that the defendant has violated it." *Id.* (internal quotation marks omitted). While the plaintiff does not have to present a case with an identical factual situation, the plaintiff must show legal authority making it "apparent that in the light of pre-existing law a reasonable official would have known that the conduct in question violated the constitutional right at issue." *Id.* (internal quotation marks and ellipsis omitted). In determining whether a right was clearly established, we look for Supreme Court or Tenth Circuit precedent on point or clearly established weight of authority from other courts finding the law to be as the plaintiff maintains. *See id.*

We note that a qualified immunity question may be submitted to a jury when disputed issues of material fact exist. *See Gonzales v. Duran*, 590 F.3d 855, 859 (10th Cir. 2009). Where such factual disputes are present, the district court can "submit special interrogatories to the jury to establish the facts" and "[b]ased on the jury's findings, the [district] court [can] then determine whether the defendant's conduct was [lawful] in light of the clearly established law." *Id.*

B. Seizure

We now turn to the plaintiffs' claims. Lundstrom and Hibner first claim their clearly established right to be free from unreasonable seizure was violated when (1) Officer Romero pulled her gun on them during the initial encounter at the front door of the home, and then when the officers (2) handcuffed Hibner and

-11-

directed her to remain on the curb, (3) effectively removed Lundstrom from his house, and (4) handcuffed Lundstrom and placed him in a police vehicle.[1]

The district court concluded those encounters either did not amount to seizures under the Fourth Amendment or were reasonable. On appeal, the officers largely adopt the district court's reasoning, arguing either the seizures did not implicate the Fourth Amendment or the need to check on a child's welfare, exigent circumstances, and concern for their safety and the safety of others justified their actions. As we discuss below, we agree in part and disagree in part with the district court's assessment at this stage of the proceedings.

1. *Legal Framework*

"Violation of the Fourth Amendment requires an intentional acquisition of physical control." *Becker v. Kroll*, 494 F.3d 904, 914 (10th Cir. 2007) (internal quotation marks omitted). A Fourth Amendment seizure occurs where, considering all the circumstances, a reasonable person would not feel free to leave or disregard the contact. *See Petersen v. Farnsworth*, 371 F.3d 1219, 1221–22 (10th Cir. 2004). In determining whether a seizure was constitutional, we "balance the nature and quality of the intrusion on the individual's Fourth

---

[1] In their opening brief to this court, Lundstrom and Hibner argue they were subjected to illegal pat down searches after being seized. The district court refused to consider that argument, however, because such an allegation was not presented in Lundstrom and Hibner's complaint. Lundstrom and Hibner do not challenge the district court's pleading determination on appeal. We therefore do not address this argument.

Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Weigel v. Broad*, 544 F.3d 1143, 1162 (10th Cir. 2008), *cert. denied*, 129 S. Ct. 2387 (2009). The reasonableness of a police officer's actions is evaluated from the perspective of a reasonable officer on the scene, recognizing the police officer may have been forced to make split-second decisions in a stressful, dynamic, and dangerous environment. *See Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1188 (10th Cir. 2001).

The facts of this case involve allegations of investigative detentions— Fourth Amendment seizures of limited scope and duration requiring reasonable suspicion of criminal activity. *See United States v. White*, 584 F.3d 935, 944–45 (10th Cir. 2009), *cert. denied*, 130 S. Ct. 1721 (2010). We conduct a two-step inquiry to determine whether an investigative detention was reasonable under the Fourth Amendment. First, we assess whether the detention was justified at its inception. *See United States v. Cervine*, 347 F.3d 865, 868 (10th Cir. 2003). For an investigative detention to be valid, an officer must have had "objectively reasonable articulable suspicion" that a detainee committed or is about to commit a crime. *Id.* at 869. "The court views the totality of the circumstances to see whether the detaining officer had a particularized and objective basis for suspecting legal wrongdoing." *Cortez v. McCauley*, 478 F.3d 1108, 1123 (10th Cir. 2007) (en banc) (internal quotation marks omitted).

Second, we evaluate whether the officer's actions were "reasonably related in scope to the circumstances that first justified the interference." *Cervine*, 347 F.3d at 868 (internal quotation marks omitted). A police officer may take such steps as are reasonably necessary to protect his safety and to maintain the status quo during a detention. *See United States v. Garcia*, 459 F.3d 1059, 1063 (10th Cir. 2006).

If a police-citizen encounter exceeds the limits of an investigative detention, it then becomes an arrest that must be supported by probable cause. *See United States v. Rodriguez-Rodriguez*, 550 F.3d 1223, 1227 (10th Cir. 2008). "Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed." *Buck v. City of Albuquerque*, 549 F.3d 1269, 1281 (10 Cir. 2008) (internal quotation marks omitted). While there is no litmus-paper test for determining when an investigative detention enters the realm of an arrest, we have stated an arrest is distinguished from an investigative detention "by the involuntary, highly intrusive nature of the encounter." *See Cortez*, 478 F.3d at 1115. "[T]he use of firearms, handcuffs, and other forceful techniques," for example, generally indicate an investigative detention has evolved into an arrest. *Id.* at 1115–16.

We have recognized that, in fulfilling their duties, police officers may exercise functions—"community caretaking functions"— wholly separate and apart from detecting, investigating, or acquiring evidence of a crime. *United*

-14-

*States v. Garner*, 416 F.3d 1208, 1212 (10th Cir. 2005). Police officers carrying

out such functions may, in certain circumstances, properly detain a person. *See*

*id.* at 1212–13. "Like an investigative detention, . . . a community caretaking

detention must be based upon specific and articulable facts which reasonably

warrant an intrusion into the individual's liberty." *Id.* at 1213 (internal

punctuation and quotation marks omitted). In addition, the government's interest

must outweigh the individual's interest in avoiding arbitrary governmental

interference. *See id.* "[T]he [community caretaking] detention must last no

longer than is necessary to effectuate its purpose, and its scope must be carefully

tailored to its underlying justification." *Id.*

With this framework in mind, we turn to the facts as alleged by Lundstrom

and Hibner.

### 2. *Application*

For ease of discussion, we address the plaintiffs' seizure allegations in

roughly chronological order.

#### a. Encounter at the Door

Lundstrom and Hibner first contend Officer Romero illegally seized them

when she pulled her gun on Lundstrom during the initial encounter at the front

door.[2] The district court concluded a lawful seizure was effected when Officer

---

[2] Before the district court, Lundstrom and Hibner argued Officer Romero
perpetrated an illegal seizure when she approached the front door of the house.

(continued...)

Romero pointed her gun at Lundstrom, determining Officer Romero acted reasonably to alleviate a perceived threat to her safety, and that no cognizable seizure occurred when Officer Romero's gun was pointed at Hibner because the show of authority was not directed at her and she did not submit to it. The officers argue no seizure occurred when Officer Romero pointed her gun at Lundstrom because he did not submit to the show of authority—rather, he closed the door. Alternatively, based on reasoning similar to the district court's, the officers contend that, if a seizure was effected, it was reasonable because Officer Romero acted appropriately in response to a possible threat to her safety. The officers also argue, as the district court found, that Hibner was not seized when Officer Romero's gun was pointed at her because Officer Romero's directives were not addressed to Hibner. We conclude the district court's assessment was correct.

As an initial matter, the use of a gun does not in and of itself make an encounter an unlawful seizure. *See United States v. Copening*, 506 F.3d 1241,

[2](...continued)
Since Lundstrom voluntarily opened the door, the district court found the initial encounter was consensual and did not implicate the Fourth Amendment. The officers support the district court's consensual-encounter rationale. To the extent Lundstrom and Hibner raise this argument on appeal, we conclude Lundstrom and Officer Romero were engaged in a consensual encounter—an encounter not amounting to a seizure for purposes of the Fourth Amendment—up until Officer Romero pulled her gun on Lundstrom. *See Muehler v. Mena*, 544 U.S. 93, 101 (2005) ("[M]ere police questioning does not constitute a seizure . . . .") (internal quotation marks omitted).

1248 (10th Cir. 2007). "[T]he use of guns in connection with a stop is permissible where the police reasonably believe the weapons are necessary for their protection." *United States v. Neff*, 300 F.3d 1217, 1220 (10th Cir. 2002) (internal quotation marks omitted). "[T]he pointing of firearms should[, however,] be predicated on at least a perceived risk of injury or danger to the officers or others, based upon what the officers know at that time." *Thomas v. Durastanti*, 607 F.3d 655, 669 (10th Cir. 2010) (ellipsis and internal quotation marks omitted). In determining whether the use of weapons was reasonable, we look to the totality of the circumstances as viewed from the perspective of a reasonable officer on the scene. *See Holland*, 268 F.3d at 1188.

Here, Officer Romero was responding to a neighbor's report that a young child was struck in a backyard during a rainstorm. When Lundstrom opened the front door, he was openly suspicious that Officer Romero, while uniformed, was not an actual APD officer. When asked about a child, Lundstrom denied there was a child at the house. During the encounter, Officer Romero's view was obstructed and she became concerned the object Lundstrom was holding might be a weapon. By that time, the conversation had escalated and sharp words had been exchanged, enough so that Hibner started towards the door. At that point, Officer Romero drew her gun to protect her safety and kept it pointed at Lundstrom only for so long as necessary to determine he was not armed—Officer Romero lowered

-17-

her gun when Lundstrom raised his hands and she could see he was holding a telephone.

On these facts, when Officer Romero briefly pointed her gun at Lundstrom, she effectuated a reasonable seizure since she had a reasonable concern about her safety. *See United States v. Perdue*, 8 F.3d 1455, 1462–63 & n. 5 (10th Cir. 1993) (holding that effectuating an investigative detention by pointing guns at an individual was reasonable where the officers had reason to fear for their safety and noting officers need not be absolutely certain the individual is armed because the issue is whether reasonably prudent persons in the circumstances would be warranted in the belief that their safety is at risk). The encounter was limited in time and scope; Romero lowered her gun as soon as she saw Lundstrom's hands.

Nor was Hibner illegally seized when she positioned herself between Officer Romero and Lundstrom at the front door. Nothing indicates Officer Romero wilfully sought to detain Hibner at that point or intentionally pointed the gun at her. Rather, Hibner inserted herself in the encounter between Officer Romero and Lundstrom. *See Oliveros v. Mitchell*, 449 F.3d 1091, 1095 (10th Cir. 2006) (noting unreasonable seizure claims "are necessarily predicated on intentional conduct"); *Claybrook v. Birchwell*, 199 F.3d 350, 359 (6th Cir. 2000) ("[T]he authorities [cannot] 'seize' any person other than [the] one who [is the] deliberate object of their exertion of force.") (cited with approval in *Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008)). Officer Romero did not

command Hibner or request anything of her, and the weapon was lowered as soon as Lundstrom complied with Officer Romero's request to see Lundstrom's hands.

In these circumstances, we conclude Hibner was not subjected to a Fourth Amendment seizure.

### b. Handcuffing of Hibner

Next, Hibner contends the officers unreasonably seized her after she left the house, when they handcuffed her and directed her to remain seated on the curb. The officers argue their detention of Hibner was reasonable based on their interest in securing the area around the house while they dealt with the volatile situation Lundstrom presented. They contend their actions were reasonable in light of their concern for their safety and Hibner's safety. The district court held Hibner's detention was reasonable for protective purposes and because the officers had a basis for believing she may have been involved in mistreating the child about whom the neighbor called 911. We disagree.

Handcuffing may be appropriate during an investigative detention—an investigative detention does not become unreasonable just because officers handcuff an individual. *See Neff*, 300 F.3d at 1220. Officers are authorized to handcuff individuals during the course of investigative detentions if doing so is reasonably necessary to protect their personal safety or maintain the status quo. *See id.* "However, the use of handcuffs is greater than a de minimus intrusion and thus requires the government to demonstrate that the facts available to the officer

-19-

would warrant a man of reasonable caution in the belief that the action taken was appropriate." *United States v. Albert*, 579 F.3d 1188, 1193 (10th Cir. 2009).

On the record before us, handcuffing Hibner was not a reasonable response to the circumstances presented to the officers. At the time of this encounter, the facts, as interpreted in the light most favorable to Lundstrom and Hibner, were the following: Hibner had cooperated with the officers; the officers had not yet uncovered any evidence of a child; Lundstrom had denied a child was at the house; Lundstrom was unarmed and speaking with the 911 operator; and none of the officers had yet interviewed Hibner about a child in the home.

Even granting the officers some latitude in undertaking their community caretaking role, the actions they took in the course of detaining Hibner were not reasonably related in scope to the investigation. First, the officers did not interview Hibner concerning her knowledge of the circumstances. Rather than undertake the most rudimentary investigation—asking Hibner what happened—the officers handcuffed her and led her to the curb. At that time, the officers had yet to confirm any fact relating to the neighbor's report with Lundstrom or Hibner, nor did they have a reason to suspect foul play. While the officers need not have conducted a full investigation during the evolving situation, *Armijo v. Peterson*, 601 F.3d 1065, 1072 (10th Cir. 2010), every fact presented to them since their arrival at the home indicated there was no ongoing emergency. Second, Hibner did not act in a threatening manner, nor did she refuse to

cooperate with police. Thus, she provided no reasonable basis for the officers to be concerned for their safety. Finally, nothing demonstrates Lundstrom posed a threat to Hibner—he was in the house, unarmed, and on the phone with 911.

While certainly the situation was confusing, the officers escalated their use of force against a person who posed no objective threat to officer safety or their ability to wrap up the investigation. *See Cervine*, 347 F.3d at 868 (stating the scope of an investigative detention must be reasonably related to the underlying circumstances); *Garner*, 416 F.3d at 1213 (stating same with respect to a community caretaking detention). Because the officers' actions were not reasonably related in scope to the justification for Hibner's seizure, her detention violated the Fourth Amendment.

### c. Lundstrom—In His House

Lundstrom contends the officers unreasonably seized him when they surrounded his house, ordered him to exit, and he complied with their instructions. The district court ruled this encounter did not amount to an unlawful seizure because the officers were conducting a child welfare check pursuant to their community-caretaking function, exigent circumstances existed, and Lundstrom did not yield to the officers' show of authority. We do not agree with the district court's conclusions.

First, we find, on the record before us, that Lundstrom did yield to the officers' assertion of authority and was seized. While Lundstrom may not have

-21-

obeyed the officers' directives initially, he did ultimately leave his house pursuant to the dispatcher's instruction that he do so. Under the circumstances presented, we see no distinction between an order coming from the officers and one made by the dispatcher. The dispatcher was actively engaged in persuading Lundstrom to surrender to the officers, telling Lundstrom the officers were positioned around his house and they would point their guns at him if he refused to exit his residence. Dispatch insisted, "I need you to go outside." App. at 66. We conclude Lundstrom was seized for purposes of the Fourth Amendment when he complied with the officers and dispatcher's orders to leave his house. *See United States v. Martin*, No. 09-3310, 2010 WL 2977721, at *8-9 (10th Cir. July 30, 2010).

Nor at the time did the officers have a "particularized and objective basis" for suspecting Lundstrom of legal wrongdoing," *Cortez*, 478 F.3d at 1123, or knowledge of facts and circumstances that would lead a "prudent man" to believe he had committed an offense, *Buck*, 549 F.3d at 1281. While Lundstrom was not as cooperative as we hope citizens would be in response to a law enforcement investigation, nothing indicated he had done anything wrong and he did not pose a threat to the officers. To the contrary, the record demonstrates: the neighbor reported hearing a *woman*—not a *man*—disciplining a child; Lundstrom told Officer Romero there was no child at the house; the neighbor backtracked about her initial story and the location of the incident; Hibner had yet to be interviewed;

-22-

some time had passed since the initial 911 call and nothing otherwise suggested criminal activity; and the officers did not perceive anything suggesting a child's presence at the house.

We stress the lack of corroborating evidence at this point in the encounter. By this time, the officers had every opportunity to interview the only other person they knew to be at Lundstrom's house concerning the reported incident—Hibner—before seizing him. If anything, the officers had reason to believe a woman was involved in the incident. That person could only have been Hibner. And, the neighbor's statement that she might have reported the wrong address did not provoke the officers to pause or inquire further before seizing Lundstrom. Based on the totality of the circumstances, the officers did not have objectively reasonable grounds to seize Lundstrom at this point. *See Garner*, 416 F.3d at 1213.

Finally, no exigent circumstances existed which would justify Lundstrom's seizure. Exigent circumstances may justify a search or seizure at a home without a warrant, or probable cause, where the need exists to assist persons who are seriously injured or threatened with such injury. *See Armijo*, 601 F.3d at 1073. When officers are acting in furtherance of routine investigatory purposes, however, they may search or seize an individual at a home only if they have a warrant or exigent circumstances are present and they have probable cause. *See id.* at 1073. The government must demonstrate exigency excused adherence to the

Fourth Amendment's ordinarily applicable requirements. *See United States v. Najar*, 451 F.3d 710, 717 (10th Cir. 2006). In determining whether exigent circumstances justified a seizure, we assess: (1) whether the officer had an objectively reasonable basis to believe there was an immediate need to protect the lives or safety of himself or others; and (2) whether the manner and scope of the search or seizure was reasonable. *See id.* The court evaluates "whether the officers were confronted with reasonable grounds to believe there was an immediate need guided by the realities of the situation presented by the record from the viewpoint of prudent, cautious, and trained officers." *Id.* at 718–19 (internal quotation marks omitted).

Taking into account all of the circumstances and the information the officers had, including the exculpatory information discussed above, exigent circumstances did not support Lundstrom's seizure. The officers did not have a reasonable basis for believing Lundstrom posed an immediate threat to them, himself, Hibner, or anyone else. Nor did they have grounds to believe a child was in the home—Lundstrom denied it and Hibner's knowledge had been ignored to this point. At the time, Lundstrom was on the telephone with the dispatcher, there was no one else known to be in the house, and the officer in the backyard could see Lundstrom moving about the residence, albeit "frantically." App. at 88. Reviewing the record from the viewpoint of a "prudent, cautious, and trained" officer, we do not find that the officers were confronted with reasonable grounds

-24-

to believe there was an immediate need to seize Lundstrom. *Najar*, 451 F.3d at 718–19; *compare Armijo*, 601 F.3d at 1072 ("[I]f the officers acted reasonably, they need not exhaust every avenue of dispelling suspicion. Perhaps more investigation would have been worthy. Then again, given the imminence of the threatened attacks, perhaps any delay would risk too much."). We note we might have reached a different conclusion if the record contained some indication of a child's presence.

Because the officers seized Lundstrom without adequate justification, they violated his constitutional right to be free from unreasonable seizure.

### d. Lundstrom—Handcuffing

We need not linger on this point. Since we conclude Lundstrom was unreasonably detained when ordered from his house, the handcuffing was merely a continuation of that detention. Handcuffing may have been justified if the initial detention were justified. For purposes of this case, however, the initial unreasonable seizure suffices for purposes of Lundstrom's Fourth Amendment claim based on handcuffing. We find it sufficient to recognize that the officers' handcuffing of Lundstrom and placement of him in a police vehicle merely prolonged Lundstrom's illegal detention, adding to the level of its unreasonableness. *See United States v. Rosborough*, 366 F.3d 1145, 1150 (10th Cir. 2004) (stating that even an investigative detention justified at its inception must also be limited in scope and duration to be held reasonable and the breadth

-25-

and length of a detention must be reasonably tailored to the legitimate law enforcement purposes to be served by it).

To emphasize again, considering all the circumstances, including the available exculpatory information and reasonable avenues of investigation, the officers did not have reasonable suspicion or probable cause to detain Lundstrom. In fact, by this time, for the reasons discussed above, the officers had less reason to suspect Lundstrom of committing a crime.

* * *

In sum, Lundstrom and Hibner adequately alleged violations of their Fourth Amendment rights to be free from unreasonable seizure.

### 3. *Clearly Established*

At the time of the incident, it was clearly established that a police officer cannot effect an investigative detention without reasonable suspicion. *See Cortez*, 478 F.3d at 1108 (citing *Hibel v. Sixth Judicial Dist. Ct. of Nev.*, 542 U.S. 177, 185 (2004)). It was similarly established that community caretaking detentions must be based on specific articulable facts warranting an intrusion into an individual's liberty. *See Garner*, 416 F.3d at 1213 (citing *United States v. King*, 990 F.2d 1552, 1560 (10th Cir. 1993)). It was also unambiguous that a police officer must have probable cause to arrest an individual. *See Cortez*, 478 F.3d at 1117 (citing *Tennessee v. Garner*, 471 U.S. 1, 7 (1985)). "Furthermore, it was [clearly] established law that the probable cause standard of the Fourth

-26-

Amendment requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention." *Cortez*, 478 F.3d at 1117 (internal quotation marks omitted) (citing *Romero v. Fay*, 45 F.3d 1472, 1476–77 (10th Cir. 1995)).

We have no difficulty in finding a reasonable officer would have understood the alleged conduct violated the constitutional right to be free from unreasonable seizure.

C. Lundstrom—Excessive Force

Lundstrom also contends the district court erred in granting summary judgment on his excessive force claim. He argues the officers violated his clearly established right to be free from unreasonable force by pressing, shoving, and twisting him after he had been handcuffed. The district court held the force used against Lundstrom was reasonable, given the officers' interests in checking on the welfare of a child and ensuring their safety. In the alternative, the officers argue it was not clearly established that the measures they used against Lundstrom amounted to excessive force. We disagree.

"The right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Conner*, 490 U.S. 386, 396 (1989). In determining whether a use of force is reasonable under the Fourth Amendment, we balance the nature and

quality of the encroachment on the individual's Fourth Amendment interests

against the government's countervailing interests. *See id.* But we are mindful:

> Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. And we take seriously that this calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation.
>
> [There are] three, non-exclusive factors relevant to [an] excessive force inquiry: [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight.

*Fisher v. City of Las Cruces*, 584 F.3d 888, 894 (10th Cir. 2009) (citing *Graham*)

(internal quotation marks and citations omitted). Whether a use of force was

reasonable is an objective inquiry, without regard to a police officer's intent or

motivation. *See id.*

The facts Lundstrom and Hibner allege demonstrate the officers used an

unconstitutional level of force against Lundstrom. Viewing the facts in the light

most favorable to Lundstrom and Hibner, as we must, Lundstrom came out of his

house with his hands up and in full view of the officers. As Lundstrom emerged

from the house, the officers pointed their weapons at him. Lundstrom was then

handcuffed and patted down. After being handcuffed, Lundstrom claims he was

pressed up against a vehicle and shoved to the ground. An elbow or knee was

then placed against the back of his head and his arm was twisted and "rolled up

onto his head." App. at 93. Finally, Lundstrom, still handcuffed, was placed in a police vehicle. As a result of the officers' actions, Lundstrom alleged he sustained injuries to his knees, neck, and head.

If the allegations are true, the amount of force used against Lundstrom was unreasonable. First, while the allegations of child abuse were serious and warranted investigation, by the time the officers handcuffed Lundstrom they lacked any evidence he had committed the reported crime or even that a crime had been committed at Lundstrom's house. Nor did the officers have specific articulable facts sufficient to support detaining Lundstrom for purposes of carrying out a community caretaking detention. Because there was scant indication Lundstrom was involved in a crime at all, the crime-at-issue factor did not support the officers' use of force.

Second, the threat Lundstrom posed to the safety of the officers and others weighs against concluding the officers' use of force was reasonable. Lundstrom exited his house in full view of the officers with his hands up. He was handcuffed and patted down without incident. Nothing suggests Lundstrom was anything but compliant after leaving the house or that the handcuffed Lundstrom posed a threat to the officers. Yet he claims he was then pressed against a vehicle, shoved to the ground, had an elbow or knee placed against the back of his head, and had his arm twisted and forced upwards. While he told the dispatcher he would resist if the officers assaulted him, by the time he was handcuffed

Lundstrom was not a threat to anyone.  The threat-to-safety factor therefore does not support the officers' application of force.

Finally, that Lundstrom was not resisting arrest or attempting to flee weighs against determining the force the officers employed was reasonable.  As the above discussion concerning the safety threat Lundstrom presented makes clear, nothing before us suggests Lundstrom did not comply with the officers' instructions after leaving the house or that he resisted or attempted to flee from the officers.  Accordingly, the resistance-or-flight factor did not support the officers' use of force.

Considering the totality of the circumstances and the *Graham* factors, we conclude Lundstrom sufficiently alleges the officers used unreasonable force.

At the time of the incident, it was clearly established that a police officer's violation of the *Graham* reasonableness test amounted to a violation of the Constitution if there were no substantial grounds for a reasonable officer to believe there was legitimate justification for acting as he did.  *See Buck*, 549 F.3d at 1291 (citing *Holland*, 268 F.3d at 1197).  "Considering that under the plaintiff[s'] version of events each of the *Graham* factors lines up in [their] favor, this case is not so close that our precedents would fail to portend the constitutional unreasonableness of defendants' alleged actions."  *Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008) (brackets omitted).  We conclude the contours of the right to be free from the use of excessive force were

-30-

sufficiently clear that a reasonable officer would have understood the officers'

actions violated that right.

D. Search

Finally, Lundstrom and Hibner contend the district court should not have

granted summary judgment on their unreasonable search claim.  They argue the

officers violated their clearly established right to be free from unreasonable

search by entering Lundstrom's house without a warrant and absent exigent

circumstances.[3]  The district court found that exigent circumstances existed,

making the officers' entry and search of Lundstrom's residence and backyard

reasonable.  The officers argue, similarly, that their search was not illegal because

they reasonably believed a child was in need of immediate aid.  The also contend,

in the alternative, it was not clearly established that their search of the house was

unreasonable under the circumstances.  We disagree.

Searches inside a home without a warrant are presumptively unreasonable.

*See Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006).  That presumption

flows from the understanding "the home is entitled to the greatest Fourth

Amendment protection."  *Najar*, 451 F.3d at 712.  "Warrants are generally

required to search a person's home or his person unless the exigencies of the

situation make the needs of law enforcement so compelling that the warrantless

---

[3] Pursuant to the parties' stipulated dismissal, the scope of the officers' search of Lundstrom's house is not at issue.

-31-

search is objectively reasonable under the Fourth Amendment." *Armijo*, 601 F.3d at 1070 (internal alteration and quotation marks omitted). As discussed above, the government bears the burden of showing exigency excused compliance with the Fourth Amendment's generally applicable requirements. *See Najar*, 451 F.3d at 717. "That burden is especially heavy when the exception must justify the warrantless entry of a home." *Id.*

Individuals also have a reasonable expectation of privacy in the curtilage of their homes. *See id.* at 34. "[C]urtilage is the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life;" it is entitled to the same Fourth Amendment protections attaching to the home. *Reeves v. Churchich*, 484 F.3d 1244, 1254 (10th Cir. 2007) (internal quotation marks omitted). The court considers four factors in determining whether an area around a home is curtilage: (1) the area's proximity to the home; (2) whether the area is included within an enclosure surrounding the house; (3) the manner in which the area is used; and (4) the steps the resident has taken to protect the area from observation. *See United States v. Cousins,* 455 F.3d 1116, 1122–23 (10th Cir. 2006).

Applying these principles here, the alleged facts support the finding of a constitutional violation. Under Lundstrom and Hibner's view of the facts, after they were handcuffed, some of the officers entered and searched Lundstrom's house for approximately 10 minutes. Also, prior to the search of the house, one

of the officers either scaled a fence or opened a gate to gain access to Lundstrom's backyard, taking up a position that allowed him to observe Lundstrom in the rear of the house.

Exigent circumstances justifying the officers' search of Lundstrom's house were not present.  By then, both Lundstrom and Hibner had been handcuffed and positioned away from the house, Lundstrom had told the officers no child was at the residence, and the neighbor had indicated she might have reported the wrong address.  Further, the officers still had not come across anything evidencing the presence of a child.  The record does not indicate the officers encountered anything suggesting someone inside Lundstrom's house was in immediate danger or seriously injured.  Assessing the situation as "prudent, cautious, and trained" police officers, we find the officers were not confronted with reasonable grounds to believe there was an immediate need to enter Lundstrom's house.  *Najar*, 451 F.3d at 718–19.

For the same reasons, when the one officer entered the backyard, he did so absent exigent circumstances.  And, we have little trouble finding that Lundstrom's backyard qualified as curtilage.  Lundstrom's backyard directly abuts the rear of his house, was enclosed such that the officer had to go over a fence or open a gate to access it, was used in a manner typical of an ordinary residential backyard, and was protected from observation to an extent that

prevented the neighbor from peering into it over the fence when she attempted to investigate the noises she was hearing.

Because the officers entered Lundstrom's house and its curtilage without a warrant and absent exigent circumstances, they violated Lundstrom and Hibner's constitutional right to be free from unreasonable search.

At the time of the alleged incidents, it was clearly established that a police officer cannot enter and search a home without a warrant and absent exigent circumstances. *See Cortez*, 478 F.3d at 1124 (citing *United States v. Scroger*, 98 F.3d 1256, 1259 (10th Cir. 1996)); *Najar*, 451 F.3d at 717. It was also clearly established that the same Fourth Amendment protections attaching to the home extend to curtilage. *See Cousins*, 455 F.3d at 1122–23.

We therefore conclude a reasonable officer would have understood the actions in question violated the constitutional right to be free from unreasonable search.

E. Tort Claims

Because we conclude several of the officers' alleged actions violated the Fourth Amendment, we must also conclude summary judgment on Lundstrom and Hibner's tort claims should not have been granted. Pursuant to N.M. STAT. § 41-4-12, Lundstrom and Hibner claim the officers are liable for assault, battery, trespass, false arrest, and false imprisonment. Section 41-4-12 provides that police officers' immunity does not extend to the commission of those torts.

Based on its qualified-immunity analysis, which found the officers' conduct did not violate the Fourth Amendment, the district court held the officers had behaved lawfully and determined therefore that Lundstrom and Hibner could not demonstrate, as a matter of law, that a reasonable jury could find for them on their tort claims. As we explained, however, the officers did not fully comply with the requirements of the Fourth Amendment. Thus, examining the undisputed facts and drawing all reasonable inferences in favor of Lundstrom and Hibner, as we must, a reasonable jury could find in their favor on their tort claims.

### III. Conclusion

For the foregoing reasons, we find the officers are not entitled to qualified immunity and that they should not have been granted summary judgment. We AFFIRM in part, REVERSE in part, and REMAND for further proceedings consistent with this opinion.