**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 21, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

BRADLEY SOZA,

    Defendant - Appellant.

No. 16-2182
(D.C. No. 1:14-CR-03754-JAP-1)
(D. N.M.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BRISCOE**, **McKAY**, and **BALDOCK**, Circuit Judges.
_____

We decide whether police officers transformed a lawful investigatory stop into an unlawful arrest by brandishing their firearms and using handcuffs on an individual who bore a generic resemblance to an unidentified and potentially violent burglar but had otherwise behaved in a calm and compliant manner in front of the officers.

\*

The district court's findings of fact, which neither party challenges on appeal, tell us the following. On a June afternoon in 2014, three women were inside one of the units of a gated and generally peaceful condominium complex located in Albuquerque when they saw a man banging on the front door. This man, who the

_____

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

women later described as a Spanish male in his forties wearing a grey shirt and baseball cap, then walked around to the back of the condominium and threw a rock through the unit's sliding glass door. The women—justifiably frightened—retreated to a bedroom closet to hide. The man apparently followed the women because at some point later on the three victims heard the man say, "Hey," from outside the bedroom door.

One of the women called 911 and informed the authorities of the above sequence of events and the intruder's general description. Shortly thereafter Officers Thomas Melvin and James Demsich of the Albuquerque Police Department set out to investigate.

When they arrived at the complex, the officers circled the building in which the callers' condominium was located from opposite directions. As Officer Demsich was rounding one of the building's corners, he saw a man coming from another nearby building in the condominium complex across the street. Officer Demsich instructed the man "to go back in" to the building. The man immediately complied and calmly walked back to the building from which he came. Officer Demsich continued to circle the building.

The officers reunited at the broken sliding glass door in the back of the building. Officer Demsich eventually asked Officer Melvin whether he had also seen the man who had been crossing the street. Officer Melvin stated that he had not. Officer Demsich, presumably beginning to have second thoughts about his encounter with the man, indicated that the man may have matched the description of the

2

suspect—that is, a Spanish male in his forties wearing a grey shirt and baseball cap. The officers decided to investigate further and immediately crossed the street toward the building from which the man had come and to which he eventually had returned.

Soon enough the officers came across Defendant Bradley Soza—the only person the officers saw in the area—standing on the front porch of one of that building's units. Defendant indeed matched a rough description of the suspect: he was an adult Hispanic male who was wearing a baseball cap and grey sweatshirt.

Without hesitation or further inquiry the officers unholstered their firearms, held them in a low and ready position, and instructed Defendant to put his hands on his head. Defendant calmly obeyed. The officers then came up onto the porch to handcuff Defendant. Again, Defendant did not resist or otherwise make any threatening gestures or movements as they did so.

As Officer Demsich was in the process of moving Defendant's hands from the top of his head to behind his back so that he could handcuff him, he noticed that Defendant's hands were bloody. Moments later, as Officer Demsich began securing the handcuffs, Officer Melvin noticed that Defendant had shards of glass on his neck and sweatshirt. Officer Melvin commented about the glass to Officer Demsich, and Defendant, indirectly responding to the remark, offered that he had broken the sliding glass door because he had "heard something." The officers subsequently conducted two pat-down searches of Defendant and found a flashlight, syringe, knife, and loaded firearm.

3

A grand jury charged Defendant, a former convicted felon, with knowingly possessing a firearm and ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Defendant filed a motion to suppress the physical evidence and statements obtained during his arrest on Fourth Amendment grounds. The district court denied his motion. As such, Defendant entered a conditional guilty plea that expressly allowed him to appeal the district court's denial of his motion to suppress. Defendant now exercises that right.

*

Our jurisdiction arises under 28 U.S.C. § 1291. Because Defendant does not challenge any factual findings of the district court and instead argues only that the officers' actions were unreasonable under the Fourth Amendment, we review *de novo* the district court's denial of his motion to suppress. *United States v. Schuck*, 713 F.3d 563, 567 (10th Cir. 2013).

Defendant made two primary arguments to the district court in support of his motion to suppress and again utilizes these same arguments on appeal. First, he maintains that the officers violated his Fourth Amendment rights when they stepped onto what Defendant insists was his front porch—the "classic exemplar" of constitutionally protected curtilage, or the "area 'immediately surrounding and associated with the home'" that is "'part of the home itself for Fourth Amendment purposes,'" *Florida v. Jardines*, 133 S. Ct. 1409, 1414–15 (2013) (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984))—to seize him without his consent, an arrest warrant, or probable cause coupled with exigent circumstances. Second, he contends

4

that even if the officers had the right to step onto the front porch to seize him without violating the Fourth Amendment, they unlawfully arrested him in the absence of probable cause when they brandished their firearms and handcuffed him based solely on the fact that he resembled the as-of-then-unidentified burglar and was in the same general area where the crime had occurred.

Although the district court disagreed with Defendant on both points and therefore denied his motion to suppress, we reverse the district court's decision on the second basis, i.e., that the officers unlawfully arrested Defendant in the absence of probable cause.[1]  More specifically, we observe that the district court found that the officers did not see the blood on Defendant's hands or the glass on his person—evidence that would surely give rise to probable cause in this instance—until *after* they had already unholstered their guns and started the process of handcuffing Defendant.  In contrast, when the officers had initially made the decision to handcuff Defendant and began doing so, they had known only that he matched a general description of the unidentified burglar and that he was in close proximity in time and place to the burglary.  While these facts undoubtedly would have made the officers reasonably suspect Defendant was the burglar, in this particular instance they were insufficient to give rise to probable cause.  Thus, when the officers employed forceful techniques in an effort to detain Defendant by brandishing their firearms and

---

[1] Because we reverse on this ground alone, we have no need to address Defendant's first argument—that is, whether the officers violated Defendant's Fourth Amendment rights when they stepped onto the front porch to seize him without his consent, a warrant, or probable cause coupled with exigent circumstances.

5

handcuffing him, they transformed what otherwise could have been a lawful investigatory *Terry* stop into an unconstitutional arrest unsupported by probable cause.

The government takes issue with our conclusion that Defendant's matching description to the unidentified burglar and close proximity to the location of the crime do not amount to probable cause. But the two binding cases the government cites in support of its contention that a person's matching description to a suspect can give rise to probable cause are distinguishable on the basis that those descriptions were much more specific and detailed than the one in Defendant's case. For instance, in the first case, *Chambers v. Maroney*, 399 U.S. 42 (1970), the Supreme Court held that officers had probable cause to arrest defendants when the officers knew that the perpetrators of an armed robbery were driving a blue compact station wagon, that four people were in the station wagon, that one of the station wagon's occupants was wearing a green shirt, and that another of the station wagon's occupants was wearing a trenchcoat. *Id.* at 44–47. And in the second case, *United States v. Miller*, 532 F.2d 1335 (10th Cir. 1976), we held that that officers had probable cause to arrest defendants when the officers knew that the unidentified perpetrators of a bank robbery were driving a black over gold or tan Cadillac, that the Cadillac's license plate had the number YJ 8016, and that the two perpetrators were wearing distinct or unusual items of clothing (such as a wide-brimmed black hat with a white ring around the brim). *Id.* at 1336–38.

Compared to the generic description in Defendant's case, *Chambers* and *Miller* clearly involved descriptions that, from a purely statistical perspective, had a much higher probability of positively identifying the perpetrators. In *Chambers*, for example, the chances the officers would have discovered *two* individual blue compact station wagons in the vicinity carrying four people, two of whom were wearing a green shirt and a trenchcoat, would have been substantially unlikely. And in *Miller* there quite literally would have been only one car with the described license plate number. In Defendant's case, by contrast, the chances of the officers discovering multiple adult Spanish or Latino males wearing grey shirts and baseball caps in a nearby area was not nearly as unlikely. And since "[p]robable cause is established where 'a *substantial probability* existed that the suspect committed the crime,'" *Storey v. Taylor*, 696 F.3d 987, 992 (10th Cir. 2012) (emphasis added) (quoting *Kerns v. Bader*, 663 F.3d 1173, 1188 (10th Cir. 2011)), we simply cannot see how, under the totality of the circumstances of this specific case, the officers could have reasonably concluded Defendant satisfied this standard based on the simple fact that he matched a rather generic description of the suspect and was found in close proximity to the crime.[2] Granted, these circumstances would have undoubtedly alerted the officers that Defendant *may* have been the burglar. But this would have given them only reasonable suspicion to investigate Defendant further, not the

---

[2] Although we give it very little weight, the fact that Officer Demsich failed to notice Defendant might be the burglar when he first encountered him bolsters our conclusion that Defendant's appearance was generic enough to not give rise to probable cause.

7

requisite probable cause needed to arrest him. *See Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir. 2000).

Even so, the government also takes issue with our conclusion that the officers' brandishing of their firearms and handcuffing of Defendant amounted to an arrest. The government claims that even if Officers Melvin and Demsich possessed only reasonable suspicion at that time, their forceful techniques were reasonable, precautionary corollaries of an investigatory *Terry* stop of an individual who may have been a potentially violent burglar. This is admittedly a closer question, but we remain unconvinced.

While "the use of firearms, handcuffs, and other forceful techniques does not *necessarily* transform a *Terry* detention into a full custodial arrest," *United States v. Melendez-Garcia*, 28 F.3d 1046, 1052 (10th Cir. 1994) (emphasis added), "we have said such techniques *generally* exceed the scope of an investigative detention," *Morris v. Noe*, 672 F.3d 1185, 1192 (10th Cir. 2012) (emphasis in original) (internal quotation marks omitted). For a court to hold otherwise the government must show the officers' forceful techniques were "reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *United States v. Mosley*, 743 F.3d 1317, 1329 (10th Cir. 2014) (internal quotation marks omitted). This inquiry is necessarily "fact-sensitive . . . and depends on the totality of the circumstances in a given case." *United States v. Salas-Garcia*, 698 F.3d 1242, 1249 (10th Cir. 2012) (internal quotation marks omitted). That said, "[i]n weighing the officers' actions, we . . . give allowance for the fact that police officers are often

8

forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *United States v. Hood*, 774 F.3d 638, 643 (10th Cir. 2014) (internal quotation marks omitted), *overruling on other grounds recognized by United States v. Titties*, — F.3d —, No. 15-6236, 2017 WL 1102867 (10th Cir. Mar. 24, 2017).

As the district court aptly recognized, in the cases where we have upheld officers' brandishing of firearms and use of handcuffs during an investigatory *Terry* stop, the officers generally either knew or had reason to believe the suspects were armed, or they had personally witnessed the suspects acting violently. *See, e.g.*, *United States v. Paetsch*, 782 F.3d 1162, 1175 (10th Cir. 2015); *United States v. Shareef*, 100 F.3d 1491, 1502, 1506 (10th Cir. 1996); *United States v. Merkley*, 988 F.2d 1062, 1064 (10th Cir. 1993). In contrast, when the officers had no reason to believe the suspects were or could be armed and the suspects were otherwise calm and compliant, we have generally concluded that the officers' conduct amounted to an arrest. *See, e.g.*, *Maresca v. Bernalillo Cnty.*, 804 F.3d 1301, 1309–1310 (10th Cir. 2015); *Lundstrom v. Romero*, 616 F.3d 1108, 1123 (10th Cir. 2010); *Melendez-Garcia*, 28 F.3d at 1052–53.

Defendant's case provides an interesting middle-ground. On one hand, although the officers had no information suggesting the unidentified burglar was armed, they did know the burglar could *potentially* be violent because he had thrown a rock through the sliding glass door and followed the women to the bedroom. On the other hand, when the officers encountered Defendant—a man who undoubtedly

9

bore a generic resemblance to the unidentified burglar—he was completely calm and obeyed their commands on multiple occasions. What should govern: Defendant's calm and submissive demeanor, or that he potentially may have been a violent burglar?

In the particular circumstances of this case we believe that Defendant's calm and submissive demeanor takes precedence and that Officers Melvin and Demsich were too impulsive. For one thing, Defendant obeyed Officer Demsich's command to return to the building from which he came when the two first crossed paths without any resistance or objection. Thus, when the two officers encountered Defendant for a second time later on, they were aware (or at least should have been aware) that Defendant would likely obey their commands without the need for forceful techniques.

But more importantly, even if we assume that the officers did not transform their investigatory *Terry* stop into an arrest by brandishing their firearms and ordering Defendant to put his hands on his head, their quick use of handcuffs on Defendant after he willingly obeyed that order went too far. Of note, the officers did not first approach Defendant and pat him down while his hands were over his head, which would have been a much less intrusive invasion of Defendant's person. Granted, from a legal standpoint that may have been a wise decision: pat-down searches during investigatory stops require officers to have "reasonable suspicion that a person is armed and dangerous," and the officers here had no information suggesting Defendant was armed. *United States v. Fager*, 811 F.3d 381, 385 (10th

10

Cir. 2016) (internal quotation marks omitted). *But see id.* at 387 ("[A]n officer's suspicion that an individual is dangerous can affect that officer's suspicion that an individual is armed." (internal quotation marks omitted)). We nonetheless mention this omission to highlight how ludicrous it would be in this instance for us to conclude that the officers had the authority to handcuff Defendant but did not have the authority to pat him down. On the other hand, if the officers *did* in fact have the authority to pat Defendant down—a question we have no reason to definitively answer today—it begs the question why the officers chose to bypass the less intrusive method of patting Defendant down in favor of using the more intrusive method of handcuffing him. Perhaps even more surprising is that the officers used the handcuffs without even "undertak[ing] the most rudimentary investigation" and questioning Defendant about any connection he may have had to the burglary. *Lundstrom*, 616 F.3d at 1123.

Of course, the most obvious retort would be that the officers had to make a quick decision on how to proceed and that we should not second-guess from the safety of the courtroom their ultimate choice to use handcuffs. Although we are sensitive to the difficult and rapid choices police officers must necessarily make when they encounter potential criminals, we do not believe such deference justifies the officers' decision to handcuff Defendant in this instance. Defendant had obeyed their directions on at least two separate instances by that point and had made no threatening gestures or suspicious movements, the officers outnumbered Defendant two-to-one, and no other people were in the near vicinity that the officers had to be

11

concerned about protecting. As such, the officers would have had no reason to believe that the circumstances surrounding *Defendant himself* warranted the use of handcuffs. Defendant's actions—most notably putting his hands on his head while the officers brandished their firearms—dispelled any need for further invasive force.

Consequently, handcuffing Defendant was not reasonably necessary to protect the officers' personal safety and to maintain the status quo during the course of the stop. As a result, the officers unlawfully arrested Defendant in the absence of probable cause when they began to handcuff him, and the evidence collected by the officers after that point—the blood and glass on his person; his statement that he broke into the condominium because he "heard something"; and the flashlight, syringe, knife, and loaded firearm found pursuant to the searches of his body—must be suppressed.[3]

---

[3] To the extent any of the evidence is fruit of the poisonous tree, we conclude that (1) Defendant has established the requisite factual nexus between his unlawful seizure and the challenged evidence, and (2) the government has waived any argument to the contrary that the evidence is not fruit of the poisonous tree. *See United States v. Olivares-Rangel*, 458 F.3d 1104, 1108–09 (10th Cir. 2006).

\*

We REVERSE the district court's denial of Defendant's motion to suppress and REMAND for further proceedings not inconsistent with this opinion.[4]

Entered for the Court


Bobby R. Baldock
Circuit Judge

---

[4] We take a quick moment to commend counsel for the government and Defendant on the excellent advocacy they both offered in their briefs and at oral argument. Likewise, although we reverse the district court, we praise it for the outstanding and meticulous opinion it drafted in this case. We notice when parties and district courts alike put substantial effort into a case and believe such efforts are worthy of remark.