FILED
United States Court of Appeals
Tenth Circuit

October 22, 2012

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

v.

JOSE ERNESTO SALAS-GARCIA,

     Defendant-Appellant.

No. 11-2204

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. 1:09-CR-03597-LH-1)**

---

Jason Bowles (B. J. Crow and Monnica L. Garcia, with him on the briefs), of Bowles and Crow, Albuquerque, New Mexico, for Defendant-Appellant.

David N. Williams, Assistant United States Attorney, (Kenneth J. Gonzales, United States Attorney, with him on the brief), Albuquerque, New Mexico, for Plaintiff-Appellee.

---

Before **BRISCOE,** Chief Judge, **McKAY** and **GORSUCH**, Circuit Judges.

---

**BRISCOE**, Chief Judge.

---

     This is a direct appeal by Jose Salas-Garcia following his conditional plea of guilty to one count of conspiring to possess with the intent to distribute more than

500 grams of cocaine in violation of 21 U.S.C. § 846, and one count of possessing more than 500 grams of cocaine with the intent to distribute in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B). Prior to his plea, he moved to suppress drugs found in the vehicle he was driving as well as statements he made to police, arguing that he was illegally arrested and the evidence subsequently obtained was the fruit of a constitutional violation. The district court denied his motion to suppress. Salas-Garcia entered a conditional guilty plea on both counts. Thereafter, Salas-Garcia sought to withdraw his guilty plea because he did not fully understand the immigration consequences of his plea. He argued he had an absolute right to withdraw his plea because the district court had not yet accepted it. The district court denied his motion to withdraw his guilty plea and sentenced Salas-Garcia to concurrent terms of sixty months' imprisonment and a four-year term of supervised release. We affirm the district court's denial of Salas-Garcia's motion to suppress and dismiss Salas-Garcia's appeal from the district court's denial of his motion to withdraw his guilty plea.

## I. BACKGROUND

In September 2009, officers of the Middle Rio Grande Narcotics Task Force arrested an individual for distributing cocaine. Following his arrest, this individual became a confidential informant for the Task Force. In late November 2009, the confidential informant identified Edgar Castaneda as a broker of large

cocaine sales.[1]  Task Force Agent Oscar Villegas then devised a plan for the

confidential informant to arrange a buy of a large quantity of cocaine from

Castaneda.

On December 2, 2009, the confidential informant reported to Agent Villegas

that Castaneda was ready to deliver one kilogram of cocaine, with the exchange to

take place in the parking lot of Presbyterian Hospital, located at the intersection of

Central Avenue and Cedar Street in Albuquerque, New Mexico.  Agent Villegas,

along with Agent Clarence Davis and other members of the Task Force in

unmarked cars, followed Castaneda as he drove a red Chrysler sedan to La Poblana

Tortilleria.  Salas-Garcia arrived at the tortilla factory a few minutes later in a red

Dodge truck, and Salas-Garcia and Castaneda drove their vehicles toward

Presbyterian Hospital, mimicking each other's lane changes.  Agents Villegas and

Davis knew from experience that drug traffickers often use two or three vehicles

as a counter-surveillance technique to either elude law enforcement or to prevent

the theft of the drugs they are delivering.  Castenada and Salas-Garcia both pulled

into the parking lot of Presbyterian Hospital, and the confidential informant then

reported to Agent Villegas that "the drugs are here."  Aplt. App. at 7-8.  Castenada

pulled into the hospital's Emergency Room parking lot and Salas-Garcia headed

---

[1] A cocaine broker does not own the cocaine, but acts as a middleman between the buyer and the seller.  A buyer would contact the broker, and the broker would arrange a sale between the buyer and the seller.  See Aplee. Supp. App. at 138.

3

toward Pediatric Urgent Care on the south side of the hospital. Agent Villegas observed a female, who appeared to be coming from the hospital, enter Salas-Garcia's truck. Agent Villegas then directed marked police units to stop both Castenada and Salas-Garcia in their respective vehicles.

Salas-Garcia was stopped by a uniformed officer and was immediately placed in handcuffs. Agent Villegas arrived on the scene seconds after the stop occurred and approached the female passenger in the truck that Salas-Garcia was driving. The passenger told Agent Villegas that the driver of the truck was her ex-husband, and that he had unexpectedly called to tell her that he would be picking her up from work. Agent Villegas concluded that she was not involved in the cocaine transaction and advised Ms. Salas-Garcia that she was free to leave. Approximately two minutes after Agent Villegas arrived at the hospital, Agent Davis came to where Salas-Garcia was stopped. At this point, Agent Villegas turned the investigation over to Agent Davis, and Agent Villegas returned to his office to initiate procurement of a search warrant. Agent Davis informed Salas-Garcia that he was not under arrest and that the officers were conducting an investigation. Officers patted down Salas-Garcia while he remained in handcuffs, and Salas-Garcia agreed to stay and cooperate with the investigation. After conferring with Agent Villegas via radio, Agent Davis instructed the patrol officer to remove Salas-Garcia's handcuffs, which he had been wearing for approximately four to ten minutes. Salas-Garcia then sat on a nearby curb. Agent Villegas also

4

informed Agent Davis that he had requested a drug-sniffing K-9 unit because he was unsure which vehicle was carrying the drugs. After inspecting Salas-Garcia's driver's license, Agent Davis recognized his name from an independent Drug Enforcement Agency (DEA) investigation regarding suspected drug trafficking. Agent Davis then contacted DEA Agent Jeffrey Mauldin, and when Agent Mauldin arrived at the scene approximately ten minutes after he was alerted of the stop, Salas-Garcia was no longer in handcuffs.

Agent Davis informed Salas-Garcia that he wanted to ask some "investigatory questions." Id. at 9. Agent Davis advised Salas-Garcia of his Miranda rights in Spanish. Salas-Garcia stated that he understood his rights and agreed to speak with Agent Davis without the presence of an attorney. Agent Davis's gun was not displayed, and neither the uniformed patrol officer nor Agent Mauldin were in the immediate vicinity.

Agent Davis asked Salas-Garcia if he had any drugs with him. Salas-Garcia responded, "yes." Id. at 10. Agent Davis asked where the drugs were, and Salas-Garcia answered that they were in his truck. When asked about the quantity of drugs in the truck, Salas-Garcia answered, "a kilo." Id. Agent Davis asked if the drugs were cocaine, and Salas-Garcia said, "I think so." Id. Salas-Garcia stated the drugs were located near the center of the truck "with the tortillas and chilies from the store." Id. Salas-Garcia also stated that he was delivering the drugs for another person and was to receive $400 for transporting the drugs to the hospital.

5

Agent Villegas sought and obtained a search warrant for the red Dodge truck. After conducting a search of the truck, officers found a brick of cocaine in the center of the second row seats in a bag containing chilies. Following this discovery, Salas-Garcia was then arrested and subsequently charged.

In district court, Salas-Garcia sought to suppress the physical evidence and statements obtained as a result of his seizure on December 2, 2009, and the search of the red Dodge truck. The district court denied Salas-Garcia's motion to suppress.

On January 7, 2011, Salas-Garcia appeared before a magistrate judge and entered a conditional plea of guilty to both counts in the indictment. In the plea, Salas-Garcia reserved the right to appeal the denial of his motion to suppress. The plea agreement also described the immigration consequences of his plea. Salas-Garcia is a legal permanent resident of the United States, and deportation to his home country is presumptively mandatory because he is pleading guilty to two aggravated felonies.

Salas-Garcia then retained new counsel and sought to withdraw his guilty plea on grounds that the district court had not yet accepted his guilty plea and that he did not fully understand the immigration consequences of his plea. After a hearing, the district court denied the motion. The district court sentenced Salas-Garcia to a term of sixty months' imprisonment followed by a term of supervised release of four years. Salas-Garcia appeals the district court's denial of his motion

6

to suppress and the district court's denial of his motion to withdraw his guilty plea.

## II. DISCUSSION

### A. Motion to Suppress

Salas-Garcia argues that the officers exceeded the scope of the Terry stop and lacked probable cause to handcuff and detain him prior to questioning. Accordingly, Salas-Garcia argues, his responses to the subsequent questioning and the drugs seized from the truck were fruits of the poisonous tree and should be suppressed. "The poisonous tree doctrine allows a defendant to exclude evidence 'come at by exploitation' of violations of his Fourth Amendment rights." United States v. Jarvi, 537 F.3d 1256, 1259 (10th Cir. 2008) (quoting Wong Sun v. United States, 371 U.S. 471, 487-88 (1963)).

In reviewing the denial of a motion to suppress, "'we view the evidence in the light most favorable to the government, accept the district court's findings of fact unless clearly erroneous, and review de novo the ultimate determination of reasonableness under the Fourth Amendment.'" United States v. Polly, 630 F.3d 991, 996 (10th Cir. 2011) (quoting United States v. Eckhart, 569 F.3d 1263, 1270 (10th Cir. 2009)).

#### 1. Legal Framework

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A seizure occurs when "a reasonable person

7

would not feel free to leave or disregard the contact." Lundstrom v. Romero, 616 F.3d 1108, 1119 (10th Cir. 2010) (citing Petersen v. Farnsworth, 371 F.3d 1219, 1221-22 (10th Cir. 2004)).  To determine whether a seizure is constitutional, "we must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion," Weigel v. Broad, 544 F.3d 1143, 1162 (10th Cir. 2008) (quoting Scott v. Harris, 550 U.S. 372, 383 (2007)), where "[t]he reasonableness of a police officer's actions is evaluated from the perspective of a reasonable officer on the scene." Lundstrom, 616 F.3d at 1120 (citing Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1188 (10th Cir. 2001)).

Investigative detentions are Fourth Amendment seizures of limited scope and duration requiring reasonable suspicion of criminal activity. Id.  Under Terry v. Ohio, 392 U.S. 1 (1968), the court must examine whether the investigative detention was: (1) "justified at its inception," and (2) "reasonably related in scope to the circumstances which justified the interference in the first place." Id. at 20. Throughout this analysis, the court is guided by the "touchstone" of reasonableness. Florida v. Jimeno, 500 U.S. 248, 250 (1991).  If the seizure fails the two-pronged Terry test for an investigative detention, then the seizure becomes an arrest that must be supported by probable cause. Lundstrom, 616 F.3d at 1120 (citing United States v. Rodriguez-Rodriguez, 550 F.3d 1223, 1227 (10th Cir. 2008)).

8

In Terry, the Supreme Court held that it is permissible for a police officer to "search for weapons . . . where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." Terry, 392 U.S. at 27. The standard that permits a reasonable search for weapons is "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger," and that "due weight must be given, not to [the officer's] inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." Id. In Arizona v. Johnson, 555 U.S. 323 (2009), the Supreme Court reaffirmed the holding in Terry and explained that to justify a patdown of the driver or passenger during a vehicular stop, "the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." Id. at 327.

## 2. Scope of the Stop

Salas-Garcia does not challenge the legality of the initial stop. Instead, Salas-Garcia focuses on the second prong of the Terry test and argues that "the officers exceeded the scope of the Terry stop, and lacked probable cause to handcuff and detain defendant prior to questioning him." Aplt. Br. at 16. After he was stopped by uniformed police officers, Salas-Garcia was handcuffed for approximately four to ten minutes, and was subject to a patdown search. Salas-Garcia contends the officers handcuffed him without justification and that the

9

officers lacked probable cause or justification to forcefully detain him. Id. According to Salas-Garcia, "there are no objective facts that the officers had reasonable suspicion to be concerned for their safety or probable cause to justify the more 'forceful technique' of handcuffing Mr. Salas-Garcia." Id. at 17. Furthermore, he argues that "some particularized justification needs to be present to justify the handcuffing," and that "the officers could have simply directed Salas-Garcia to sit on the curb while they conducted their detention and investigation." Aplt. Reply Br. at 6-7.

The use of handcuffs or placing suspects on the ground during a Terry stop "do[es] not necessarily turn a lawful Terry stop into an arrest under the Fourth Amendment." United States v. Perdue, 8 F.3d 1455, 1463 (10th Cir. 1993) (citing United States v. Merkley, 988 F.2d 1062, 1064 (10th Cir. 1993) (holding that the police officers' drawing of firearms and use of handcuffs was reasonable)). See also Lundstrom, 616 F.3d at 1122 ("Handcuffing may be appropriate during an investigative detention—an investigative detention does not become unreasonable just because officers handcuff an individual."). "Officers may restrain an individual to 'maintain the status quo during the course of a Terry stop.'" Morris v. Noe, 672 F.3d 1185, 1192 (10th Cir. 2012) (quoting Gallegos v. City of Colo. Springs, 114 F.3d 1024, 1031 (10th Cir. 1997) (quoting United States v. Hensley, 469 U.S. 221, 235 (1985))). But "the use of force such as handcuffs and firearms is a far greater level of intrusion, and requires the government to demonstrate that

10

'the facts available to the officer would "warrant a man of reasonable caution in the belief" that the action taken was appropriate.'" United States v. Melendez-Garcia, 28 F.3d 1046, 1052 (10th Cir. 1994) (quoting United States v. King, 990 F.2d 1552, 1562 (10th Cir. 1993) (quoting Terry, 392 U.S. at 21-22)).

Under certain circumstances, the use of handcuffs can amount to an unreasonable seizure. Whether police conduct was "reasonably related in scope to the circumstances which justified the interference in the first place," Terry, 392 U.S. at 20, is a fact-sensitive inquiry and depends on "the totality of circumstances in a given case." United States v. Banks, 540 U.S. 31, 36 (2003). Salas-Garcia cites Melendez-Garcia at length in support of his argument that the use of handcuffs exceeded the scope of the stop. There are admittedly some factual similarities between Melendez-Garcia and this case. In Melendez-Garcia, the defendant alleged that the government seized marijuana evidence in violation of his Fourth Amendment rights and sought to suppress the evidence. The defendant argued that he and his co-defendant had been illegally arrested without probable cause and that his co-defendant's consent to search of the vehicle was tainted by the illegal arrest. Melendez-Garcia, 28 F.3d at 1050. In Melendez-Garcia, DEA officers learned from a confidential informant that a transport of marijuana was planned, and officers set up surveillance of the address provided by the confidential informant. DEA officers followed the defendant and the co-defendant as they left the provided address, and the officers then summoned marked police

11

cars to stop the defendant's vehicle. Id.

However, the factual similarities between Melendez-Garcia and this case end there. In Melendez-Garcia, the officers conducted a "felony stop," where the officers pulled out their weapons and pointed them at the defendant's car, told the occupants of the cars to throw out their keys and put their hands out, and told them to exit the vehicles one at a time and walk backwards toward the officers. Id. The officers then handcuffed and frisked the individuals. Id. This court held that the stop was not justified under the Terry doctrine:

> The government does not explain or offer evidence to support an explanation why the officers . . . needed to execute a 'felony stop' when they outnumbered the defendants, executed the stop on an open highway during the day, had no tips or observations that the suspects were armed or violent, and the defendants had pulled their cars to a stop off the road and stepped out of their cars in full compliance with police orders.

Id. at 1053. Based on the totality of circumstances, the "quantum of force" used to seize the defendant was not reasonably necessary to promote safety. Id.

By contrast, the officers in this case acted reasonably under the totality of circumstances. The "quantum of force" used to detain Salas-Garcia was reasonable under the circumstances. The officers in this case did not conduct a felony arrest of Salas-Garcia. As Agent Davis explained in his testimony, a felony stop is "a very heightened state of readiness" by the police, where the officers arrive in "several units with guns drawn, giving specific orders to an occupant of a vehicle to do certain things." Aplee. Supp. App. at 96. But in this case, the patrol

12

officers were only given instructions "to stop the car." Id. As the district court noted, there is nothing in the record that suggests that the patrol officer who stopped Salas-Garcia "drew or displayed his weapon, forced Defendant to the ground, or employed restraints other than handcuffs." Aplt. App. at 16-17.

Given the limited amount of information that the Task Force agents and uniformed patrol officers had regarding Salas-Garcia, placing him in handcuffs was reasonable under the circumstances to ensure both officer and public safety. We have noted that "'[a]n officer in today's reality has an objective, reasonable basis to fear for his or her life every time a motorist is stopped.'" United States v. Albert, 579 F.3d 1188, 1194 (10th Cir. 2009) (quoting United States v. Holt, 264 F.3d 1215, 1223 (10th Cir. 2001) (en banc), abrogated on other grounds by United States v. Stewart, 473 F.3d 1265, 1268-69 (10th Cir. 2007)). In order to ensure the safety of police officers, the Supreme Court has held that "limited intrusion[s]" are reasonable when officers have reason to fear for their safety. Adams v. Williams, 407 U.S. 143, 147-48 (1972). See also United States v. Gama-Bastidas, 142 F.3d 1233, 1240 (10th Cir. 1998) ("[T]he use of firearms, handcuffs, and other forceful techniques are justified only by probable cause or when the circumstances reasonably warrant such measures.") (quotations and citations omitted). Further, this court has recognized following the issuance of Melendez-Garcia that "[a] connection with drug transactions can support a reasonable suspicion that a suspect is armed and dangerous." United States v. Garcia, 459 F.3d 1059, 1064 (10th Cir.

13

2006). See also Albert, 579 F.3d at 1194 (concluding that evidence of drug possession further elevated the danger of the police-suspect encounter); United States v. Johnson, 364 F.3d 1185, 1194-95 (10th Cir. 2004) (recognizing that drug dealing is a crime "typically associated with some sort of weapon, often guns"). The officers in the present case knew that the drug transaction was to involve one kilogram of cocaine, and given the large amount and value of drugs to be exchanged, it was reasonable for the officers to believe that the parties may be armed. See Aplee. Supp. App. at 95 (Agent Davis testifying that he has seen "hundreds and hundreds of times" that "drugs and guns go hand in hand"). See also United States v. Coslet, 987 F.2d 1493, 1495 (10th Cir. 1993) ("Guns are a ubiquitous part of the drug trade, facilitating transactions by providing protection to dealers, drugs and money.").

Agent Davis explained in his testimony that the patrol officers were ordered to stop the truck because the truck was involved in a drug transaction. The officers knew from their observations and experience that the drug transaction involved a sophisticated, two-car operation. The officers were informed by the confidential informant that one of the vehicles that they were following—either the red Dodge truck driven by Salas-Garcia or the red Chrysler driven by Castaneda—carried one kilogram of cocaine. The officers also knew that the drug transaction was to take place in the parking lot of Presbyterian Hospital and that the drugs had arrived at the parking lot. See Aplt. App. at 7-8 (noting that the

14

confidential informant reported to the officers that "the drugs are here" when the two vehicles arrived at the hospital). However, the officers did not know which vehicle carried the one kilogram of cocaine or whether any of the occupants of the vehicles were armed. And although the officers knew that Castaneda was the broker in the drug transaction, they did not know the identity of the seller. The presence of Ms. Salas-Garcia, whom Agent Villegas observed getting into the red Dodge truck driven by Salas-Garcia, only added to the uncertainty and confusion of the scene.

The officers also had reason to handcuff Salas-Garcia on the basis of public safety. See Chandler v. Miller, 520 U.S. 305, 323 (1997) ("[W]here the risk to public safety is substantial and real, blanket suspicionless searches calibrated to the risk may rank as 'reasonable.'"); King, 990 F.2d at 1560 ("[A] police officer may have occasion to seize a person, as the Supreme Court has defined the term for Fourth Amendment purposes, in order to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity. The fact that the officer may not suspect the individual of criminal activity does not render such a seizure unreasonable per se.") (citations omitted). When Castenada and Salas-Garcia arrived at the hospital, the two split up, such that Castenada pulled into the Emergency Room parking lot and Salas-Garcia headed toward Pediatric Urgent Care. The events transpired in the middle of the day, when several people were entering and leaving the parking lot of a busy hospital. According to Agent

15

Villegas's testimony, the officers' stop of Salas-Garcia had caused a commotion and traffic jam at the hospital because the route that Salas-Garcia took was one of the main routes toward the entrance of the hospital. Presbyterian Hospital security also arrived at the scene to investigate the situation. Given that the patrol officers knew that the stop involved a large drug transaction, it was not unreasonable for the officers to "exercise an amount of caution" while detaining Salas-Garcia, so to ensure both officer and public safety. Aplee. Supp. App. at 96.[2]

Salas-Garcia was only handcuffed for four to ten minutes, and he was subsequently released when the officers discovered that he was not armed and was cooperating with the police investigation. See id. at 151. An investigative detention becomes an unlawful arrest when there is no longer a reasonable basis to keep a suspect in handcuffs. United States v. Shareef, 100 F.3d 1491, 1508 (10th Cir. 1996). Here, the officers released Salas-Garcia from handcuffs as soon as they learned that he was not a safety risk. Aplee. Supp. App. at 71. Under the facts presented here, the officers' brief detention of Salas-Garcia in handcuffs did not become an unlawful arrest. See, e.g., United States v. Sharpe, 470 U.S. 675, 687-88 (1985) (holding that a twenty minute detention was reasonable and necessary for law enforcement officers to conduct a limited investigation of the

_____

[2] Contrast the officers' reasonable concern for public safety in this case with the underlying facts in Melendez-Garcia. The officers in this case detained Salas-Garcia in a busy hospital parking lot, whereas the officers in Melendez-Garcia conducted a felony stop on an open highway.

16

suspected criminal activity); <u>Albert</u>, 579 F.3d at 1191, 1195 (holding that placing the defendant in handcuffs for twenty minutes was reasonable and did not elevate the detention into an arrest).

In sum, placing Salas-Garcia in handcuffs was reasonable under the circumstances, and his detention was not an arrest that must be supported by probable cause. The handcuffing of Salas-Garcia did not exceed the bounds of an investigatory detention and thus he was not illegally arrested. Consequently, there is no basis for suppressing his statements to law enforcement or the drugs seized from the truck as fruits of the poisonous tree.

**B.      Motion to Withdraw Guilty Plea**

Salas-Garcia pled guilty before a magistrate judge, but he argues he should be allowed to withdraw his guilty plea because his plea had not been accepted, and that he did not fully comprehend the immigration consequence of his plea.[3] When there is a question of whether the district court has actually accepted the defendant's guilty plea pursuant to Federal Rule of Criminal Procedure 11, we review the issue de novo. <u>Byrum</u>, 567 F.3d at 1259.

Salas-Garcia argues that there is ambiguity as to whether the district court

---

[3] Citing <u>United States v. Hahn</u>, 359 F.3d 1315, 1325 (10th Cir. 2004), the government contends that Salas-Garcia has waived his right to appeal the district court's denial of his motion to withdraw his guilty plea by virtue of the plea agreement. To the extent that Salas-Garcia contests that the district court did not accept his plea and plea agreement, our review is not precluded by <u>Hahn</u>. <u>See</u> <u>United States v. Byrum</u>, 567 F.3d 1255, 1258 n.2 (10th Cir. 2009).

had subsequently accepted his plea or had deferred acceptance of his plea. Salas-Garcia contends that the district court ruled that his guilty plea had been accepted, but that the district court had also "deferred" acceptance of the plea. Aplt. Br. at 30. According to Rule 11(d), "[a] defendant may withdraw a plea of guilty or nolo cotendere before the court accepts the plea, for any reason or no reason." Salas-Garcia argues that if the district court had not accepted his plea pursuant to Rule 11(d), then he has an absolute right to withdraw the plea.

Magistrate judges have the authority to conduct plea hearings and accept guilty pleas. United States v. Ciapponi, 77 F.3d 1247, 1251 (10th Cir. 1996) ("[W]e hold that, with a defendant's express consent, the broad residuary 'additional duties' clause of the Magistrates Act authorizes a magistrate judge to conduct a Rule 11 felony plea proceeding, and such does not violate the defendant's constitutional rights."). Salas-Garcia expressly consented to pleading guilty before the magistrate judge. See Aplee. Supp. App. at 206 ("The Defendant, Mr. Salas, has signed a consent to proceed before a magistrate judge in a felony case."). In the plea proceeding before the magistrate judge, Salas-Garcia pled guilty and the magistrate judge accepted his guilty plea. Id. at 218-19 ("Based on these findings I accept your pleas of guilty and adjudge you guilty of the offenses charged in Count One and Count Two of the Indictment."). Salas-Garcia does not challenge the district court's conclusion that the magistrate judge had authority to accept a guilty plea.

18

Instead, Salas-Garcia points to ambiguity in the district court's language at the subsequent hearing on the motion to withdraw, where the district court explained, "[Byrum] concludes that the magistrate court may defer acceptance of a plea agreement even while accepting a plea. I conclude that that's exactly what happened here." Id. at 228. In Byrum, we held that the district court may conditionally accept the defendant's guilty plea, while deferring acceptance of the plea agreement pending review of the presentence report. Byrum, 567 F.3d at 1262 ("In sum, we conclude where a district court conducts a Rule 11 plea colloquy and then provisionally or conditionally accepts the defendant's guilty plea pending its review of the PSR, the district court has accepted the plea for the purposes of Rule 11."). In determining whether a plea has been accepted, "what matters ultimately is the language of the trial court and the context in which it is used." Id. at 1261. Here, the magistrate judge was clear in accepting Salas-Garcia's guilty plea; there is no indication that Salas-Garcia's guilty plea was accepted on a "conditional" or "provisional" basis. And under Byrum, even if the magistrate judge had deferred acceptance of the plea agreement itself, the magistrate judge accepted Salas-Garcia's plea for the purposes of Rule 11. Consequently, Salas-Garcia is not entitled to withdraw his guilty plea as an absolute right.

Salas-Garcia further argues that even if the district court had accepted his guilty plea, there is a fair and just reason to withdraw his plea pursuant to Rule

19

11(d)(2)(B), which states that "[a] defendant may withdraw a plea of guilty or nolo contendere . . . after the court accepts the plea, but before it imposes sentence if . . . the defendant can show a fair and just reason for requesting the withdrawal." The government contends that Salas-Garcia did not reserve the right in his plea agreement to challenge the district court's denial of his motion to set aside his guilty plea, and as a result, he cannot appeal this issue with this court. Whether an issue is within the scope of an appellate waiver is a legal question that this court reviews de novo. Hahn, 359 F.3d at 1325. We have adopted a three-prong analysis to review appeals brought after a defendant has entered into an appeal waiver: "(1) whether the disputed appeal falls within the scope of the waiver of appellate rights; (2) whether the defendant knowingly and voluntarily waived his appellate rights; and (3) whether enforcing the waiver would result in a miscarriage of justice." Id. Where an appeal of a denial of a motion to withdraw a guilty plea falls within the plain language of an appeal waiver provision, we have applied Hahn and enforced the waiver. See, e.g., United States v. Leon, 476 F.3d 829, 832 (10th Cir. 2007) (per curiam).

Under the first prong of the Hahn test, Salas-Garcia's appeal of the district court's denial on his motion to withdraw his guilty plea falls within the scope of his waiver of appellate rights. In determining the scope of a waiver, the court "narrowly construe[s] the scope of . . . waiver of appellate rights . . . [but] 'will hold a defendant to the terms of a lawful plea agreement.'" Hahn, 359 F.3d at

20

1328 (citation omitted) (quoting United States v. Atterberry, 144 F.3d 1299, 1300 (10th Cir. 1998)).  Salas-Garcia entered into a conditional guilty plea, reserving his right to appeal the district court's order denying his motion to suppress.  Aside from reservation of his right to appeal the motion to suppress, Salas-Garcia signed a broad waiver of appellate rights.[4]  Salas-Garcia did not reserve the right to appeal the denial of a motion to withdraw his guilty plea.

For the second prong of the Hahn test, the court will "only enforce appeal waivers that defendants enter into knowingly and voluntarily."  Id. at 1328-29 (citing United States v. Elliot, 264 F.3d 1171, 1173 (10th Cir. 2001)).  Under this factor, the court examines whether the language of the plea agreement states that the defendant entered the agreement knowingly and voluntarily, and whether there was an adequate Federal Rule of Criminal Procedure 11 colloquy.  Id. at 1325.  The defendant has the burden to prove that he did not knowingly and voluntarily enter into his plea agreement.  Id. at 1329.  Salas-Garcia claims that he was "not completely aware of the entirety of the immigration consequences to the plea agreement."  Aplt. Br. at 27.  However, the record reveals that the immigration

---

[4]     [T]he Defendant knowingly waives the right to appeal the Defendant's conviction(s) and any sentence at or under the maximum statutory penalty authorized by law.  In addition, the Defendant agrees to waive any collateral attack to the Defendant's conviction(s) pursuant to 28 U.S.C. § 2255, except on the issue of counsel's ineffective assistance in negotiating or entering this plea or this waiver.

Aplt. App. at 27.

consequences of his guilty plea could not have been clearer. The plea agreement

that Salas-Garcia entered into explicitly explains the immigration consequences of

a guilty plea:

> [P]leading guilty may have consequences with respect to Defendant's
> immigration status if Defendant is not a citizen of the United
> States. . . . Indeed, because Defendant is pleading guilty to two
> aggravated felonies, removal is presumptively mandatory. . . .
> Defendant nevertheless affirms that Defendant wants to plead guilty
> regardless of any immigration consequences that Defendant's plea
> may entail, even if the consequence is Defendant's automatic removal
> from the United States.

Aplt. App. at 27. Salas-Garcia also expressed understanding of the immigration

consequences of a guilty plea at his plea hearing:

> THE COURT: Do you understand that deportation is a consequence of
> your conviction?
> THE DEFENDANT: Yes, sir.

Aplee. Supp. App. at 213. Given the language of the plea agreement and the plea

colloquy at the plea hearing, we conclude Salas-Garcia knowingly and voluntarily

entered into the plea agreement.

Under the final factor of Hahn, the court will enforce an appellate waiver

unless it finds that "the enforcement of the waiver would constitute a miscarriage

of justice." Hahn, 359 F.3d at 1329. To constitute a miscarriage of justice, the

waiver must fall in one of the following four categories: "where the district court

relied on an impermissible factor such as race, where ineffective assistance of

counsel in connection with the negotiation of the waiver renders the waiver

invalid, where the sentence exceeds the statutory minimum, or where the waiver is

22

otherwise unlawful." Elliot, 264 F.3d at 1173. There is no evidence in the record to support any of these circumstances. We dismiss Salas-Garcia's appeal from the district court's denial of his motion to withdraw his guilty plea as barred by Hahn.

We AFFIRM the district court's denial of Salas-Garcia's motion to suppress and DISMISS Salas-Garcia's appeal from the district court's denial of his motion to withdraw his guilty plea.