FILED
United States Court of Appeals
Tenth Circuit

March 7, 2018

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

WESTIN SANDBERG,

    Plaintiff - Appellant,

v.

ENGLEWOOD, COLORADO, a
municipality; DUGAN COMER,
individually and in his official capacity as
Englewood City Attorney; TOM
SCHNEIDER, individually and in his
official capacity; CHRISTIAN CONTOS,
individually and in his official capacity;
JAMES JOHNSON, individually and in his
official capacity; ROBERT FIEGER,
individually and in his official capacity;
STEPHEN SIEGAL, individually and in
his official capacity,

    Defendants - Appellees.

No. 17-1147
(D.C. No. 1:16-CV-01094-CMA-KMT)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BRISCOE**, **LUCERO**, and **BACHARACH**, Circuit Judges.
_____

    Plaintiff-Appellant Westin Sandberg filed this 42 U.S.C. § 1983 action,

alleging that several police officers, a city attorney, and a municipal entity violated

his rights under the First, Second, and Fourth Amendments, as well as the Colorado

---

    [*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Constitution. All Defendants moved to dismiss the complaint, with the individual Defendants arguing they were entitled to qualified immunity. A magistrate judge first recommended dismissing the complaint as to all Defendants except the two officers who first responded to a 911 call and seized Sandberg's 9-millimeter pistol after encountering him inside an auto shop. After both Plaintiff and Defendants objected to the magistrate judge's recommendation, the district court partially accepted and partially rejected that recommendation, and fully granted the motion to dismiss—dismissing the claims against all Defendants, including the two officers who first responded to the 911 call. We now exercise jurisdiction under 28 U.S.C. § 1291 and AFFIRM the district court with respect to its dismissal of Sandberg's § 1983 claims, and REVERSE AND REMAND the Colorado Constitutional claim to the district court with instructions to dismiss the claim without prejudice.

**I**

On Wednesday, May 14, 2014, Sandberg set out for a day of errands in or near the Denver suburb of Englewood. According to Sandberg's complaint, he is an Iraq War veteran and "carrie[d] a firearm nearly everywhere." App. at 4. On this day, that meant Sandberg was wearing a Ruger 9-millimeter pistol in a holster on his hip. The pistol was visible to Clem Ferrari, the owner of Epic Autos, when Sandberg walked into Ferrari's shop at 9:30 a.m. Ferrari said Sandberg was "free to stay, and to have his vehicle serviced, as long as [Sandberg] refrained from handling his firearm while on Epic Autos' premises." Id. Sandberg agreed, and waited in the lobby for the mechanics to work on his vehicle.

2

About half an hour later, at 10 a.m., Sandberg walked to a 7-Eleven. John Wells, the owner of a nearby business, noticed Sandberg walking down the street with his 9-milimeter pistol on his hip. Wells thought Sandberg might have been involved with "some form of workplace violence," so Wells called 911. Id. at 5.

Shortly after Sandberg returned to the auto shop, two Englewood Police officers—Robert Fieger and James Johnson—arrived in response to the 911 call. Fieger and Johnson entered the auto shop, drew their weapons, and confronted Sandberg. They then searched Sandberg, despite his refusal of consent, and seized his pistol and 21 bullets.

Johnson and Fieger then detained Sandberg. At this point, Sandberg said he wanted to use his cell phone to record what Fieger and Johnson were doing. Fieger and Johnson denied the request.

Seven minutes after Johnson and Fieger first confronted Sandberg, Englewood Police Sergeant Christian Contos arrived at the auto shop. Contos spoke with Ferrari, the shop owner, and learned that Ferrari had given Sandberg permission to have a gun in the shop as long as Sandberg did not remove the gun from its holster. Contos then checked the serial number on the pistol and determined that Sandberg had legally obtained the gun. Contos then left the scene, with Johnson and Fieger still detaining Sandberg.

Sandberg's complaint also includes claims against Englewood Police Officer Stephen Siegal. Yet, the complaint does not mention when Siegal arrived or left, or

3

what he did at the scene other than "continue[] to detain" Sandberg along with other officers and to tell Sandberg he could not leave. See id. at 3–8.

At some point either before, during, or after Contos and Siegal were on the scene, Johnson contacted Wells, the 911 caller. According to the complaint, "Wells did not relay any information to Officer Johnson that would cause [Johnson] to believe that Mr. Sandberg had violated any law or threatened the safety of any person." Id. at 6.

Further, at some point, Sandberg asked Johnson, Fieger, and Siegal if he was free to leave. One of the officers—it is not clear who—responded that Sandberg was not free to leave because the police were "figur[ing] out what crime he had committed." Id. at 7 (internal quotation omitted).

After speaking with Wells, Johnson called Dugan Comer, the Englewood City Attorney. Johnson described the situation to Comer, and asked Comer whether the officers could charge Sandberg with any crime. Comer responded that the officers could issue Sandberg a citation for disorderly conduct if Sandberg had alarmed other citizens with his activities. It is not clear from the complaint whether Comer was referring to Sandberg being disruptive (a) in response to the police, (b) in the way that he handled his weapon outside the auto shop, or (c) by simply openly possessing a 9-millimeter pistol while walking down the street.[1]

---

[1] Though the complaint is unclear on this point, Sandberg's appellate briefing urges us to view this situation as if Comer was merely referring to the act of openly carrying a handgun. Aple. Reply Br. at 8 ("solely for openly carrying his firearm").

Johnson then called Edgewood Police Sergeant Tom Scheider.[2] According to the complaint, Scheider was never present at the scene. Over the phone, Scheider told Johnson "a charge for disorderly conduct was applicable to Mr. Sandberg's open carry of his firearm in a holster on his hip in public and at Epic Autos." Id. at 7.

Following these phone calls, Johnson and Fieger wrote Sandberg a summons for disorderly conduct.[3] They also kept Sandberg's pistol, holster, bullets, and magazine holder, and logged them in as evidence. The officers then released Sandberg. All told, the detention lasted "approximately four hours." Id.

Four months later, the Arapahoe County District Attorney dropped the disorderly conduct charge. Approximately a month after the charge was dropped, Sandberg's property was returned to him.

Two days before the two-year anniversary of the incident, Sandberg filed this complaint. Id. at 1. The complaint contains six claims: (1) a 42 U.S.C. § 1983 claim against all Defendants for violating Sandberg's Fourth Amendment rights; (2) a § 1983 claim against all Defendants for violating Sandberg's Second Amendment

---

[2] The complaint identified this Defendant as "Tom Schneider." App. at 1. But both below and on appeal, the Defendants have referred to "Tom Scheider." See id. at 90, Aplt. Br. at 3. We have adopted the Defendants' spelling.

[3] Colorado's disorderly conduct statute states: "A person commits disorderly conduct if he or she intentionally, knowingly, or recklessly . . . displays a deadly weapon, displays any article used or fashioned in a manner to cause a person to reasonably believe that the article is a deadly weapon, or represents verbally or otherwise that he or she is armed with a deadly weapon in a public place in a manner calculated to alarm." Col. Rev. Stat. § 18-9-106(1)(f).

rights; (3) a § 1983 claim against all of the individual Defendants for conspiracy;[4] (4) a § 1983 claim against Johnson and Fieger for violating Sandberg's First Amendment rights; (5) a claim under the Colorado Constitution against all Defendants; and (6) a claim against the City of Englewood, Comer, and Scheider for municipal liability and failure to train. Id. at 8–13. The Defendants filed a motion to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6).

The district court referred the motion to a magistrate judge. The magistrate judge recommended the district court dismiss the complaint as to the City of Edgewood, Comer, Scheider, Contos, and Siegal, but deny Johnson's and Fieger's motion to dismiss the First, Second, and Fourth Amendment claims.

Sandberg, Johnson, and Fieger all objected to the magistrate judge's report and recommendation. The district court then granted Defendants' motion to dismiss on all claims—including claims against Johnson and Fieger—thereby accepting in part and rejecting in part the report and recommendation. Sandberg appeals.

## II

We review de novo a district court's dismissal under Rule 12(b)(6). Colby v. Herrick, 849 F.3d 1273, 1279 (10th Cir. 2017). To survive a Rule 12(b)(6) motion, a complaint must "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Well pleaded allegations are accepted as true and "in the light most

---

[4] Sandberg has not appealed this claim.

favorable to the plaintiff." Kerber v. Qwest Grp. Life Ins. Plan, 647 F.3d 950, 959 (10th Cir. 2011) (quoting Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)).

## A. *Prosecutorial immunity for Comer*

Sandberg pursues four claims against Comer, the Englewood City Attorney. In response, Comer argues he is entitled to absolute prosecutorial immunity on all claims because he did not participate in the police investigation, but only provided advice on possible charges after the investigation was complete. We agree.

"Absolute prosecutorial immunity is a complete bar to a suit for damages under 42 U.S.C. § 1983." Mink v. Suthers, 482 F.3d 1244, 1258 (10th Cir. 2007) (citing Imbler v. Pachtman, 424 U.S. 409, 419 n.13 (1976)). To the extent a prosecutor is "initiating and presenting a case"—that is, acting as an officer of the court in a quasi-judicial role—he is absolutely immune, id. at 1259, for the activities that are "intimately associated with the judicial phase of the criminal process," Imbler, 424 U.S. at 430. But a prosecutor can lose that immunity if his activities "cast him in the role of an administrator or investigative officer rather than that of advocate." Id. at 430–31. Still, to the extent a prosecutor has to conduct administrative or investigative activities as part of his duties as an officer of the court, he is still entitled to absolute prosecutorial immunity. See Snell v. Tunnell, 920 F.2d 673, 693 (10th Cir. 1990). In looking at the prosecutor's role in the case, we can apply the "functional approach," Mink, 482 F.3d at 1259, to examine "the

7

nature of the function performed, not the identity of the actor who performed it," Forrester v. White, 484 U.S. 219, 229 (1988).

Here, Comer was not directly involved in the investigatory detention of Sandberg. Instead, Johnson only called Comer after he had completed the investigation into Sandberg's activities—including Wells' workplace violence concern. As such, the conversation with Comer was a *post hoc* consultation to assess what charges might be brought against Sandberg. When a prosecutor's only involvement is the selection of the charges to be brought, the prosecutor is eligible for absolute prosecutorial immunity. See Mink, 482 F.3d at 1261.

Thus, as the district court concluded, Comer is entitled to absolute prosecutorial immunity in this case.[5]

## B. The § 1983 claims against Johnson, Fieger, Siegal, Contos, and Scheider

Sandberg also brings claims against five members of the Englewood Police Department—Johnson, Fieger, Siegal, Contos, and Scheider—alleging they violated his rights under the First, Second, and Fourth Amendments. On each claim, all five Englewood Police officers have raised a qualified immunity defense.

"[Q]ualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Mullenix v. Luna, 136 S. Ct. 305,

---

[5] In addition to the absolute prosecutorial immunity argument, Comer alternatively argued that he is entitled to qualified immunity. Given our conclusion that Comer is entitled to absolute prosecutorial immunity, we need not address his qualified immunity argument.

8

308 (2015) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)).  In this circuit, this standard generally "requires either that there is a Supreme Court or Tenth Circuit decision on point, or that the 'clearly established weight of authority from other courts [has] found the law to be as the plaintiff maintains.'"  Patel v. Hall, 849 F.3d 970, 980 (10th Cir. 2017) (alteration in original) (quoting Klen v. City of Loveland, 661 F.3d 498, 511 (10th Cir. 2011)).  "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'"  Mullenix, 136 S. Ct. at 308 (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

Because "'clearly established law' should not be defined 'at a high level of generality,'" White v. Pauly, 137 S. Ct. 548, 552 (2017) (quoting Ashcroft v. al–Kidd, 563 U.S. 731, 742 (2011)), "[t]he dispositive question is 'whether the violative nature of *particular* conduct is clearly established,'" Mullenix, 136 S. Ct. at 308. The "inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'"  Id. (quoting Brosseau v. Haugen, 543 U.S. 194, 198 (2004)).

### 1. Fourth Amendment

Sandberg alleges that Johnson, Fieger, Contos, Siegal, and Scheider all violated his Fourth Amendment rights.  For simplicity of analysis, we divide these five Defendants into three distinct groups: (a) Johnson, Fieger, and Siegal; (b) Contos; and (c) Scheider.  We address each group in turn, concluding that all five Defendants are entitled to qualified immunity.

9

### a. *Johnson, Fieger, and Siegal*

Johnson and Fieger were the first officers to respond to Wells' 911 call. They confronted Sandberg inside the auto shop, seized Sandberg's pistol, and oversaw Sandberg's detention for approximately the next four hours. During that time, Johnson spoke on the phone with Wells and received details about Wells' concern that Sandberg may have been involved in workplace violence. Johnson later spoke with Comer, the City Attorney, and Scheider, his police sergeant. After those phone calls, the officers cited Sandberg for disorderly conduct. At some point Siegal arrived at the auto shop, assisted Johnson and Fieger with detaining Sandberg, and eventually left.[6]

The magistrate judge looked only at Johnson and Fieger, and concluded claims against those officers should not be dismissed because there was "an inference that Plaintiff's allegedly four hour detention exceeded the scope of the circumstances." App. at 218 (citing Terry v. Ohio, 392 U.S. 7, 20 (1968)). The district court came to a different conclusion. It concluded Sandberg had "insufficiently pled a Fourth Amendment violation" because he "fail[ed] to adequately plead when, during [the

---

[6] Since we are reviewing a motion to dismiss, we must take the facts in the light most favorable to the Plaintiff. See Leverington v. City of Colo. Springs, 643 F.3d 719, 723 (10th Cir. 2011). Thus, even though it is not clear when Siegal arrived or left, we will assume Siegal was present for both (a) Sandberg's initial detention, while the officers investigated the 911 call, and (b) some point after the officers realized Sandberg had not actually been involved in any workplace violence.

four-hour detention], Defendants['] reasonable suspicion was dispelled . . . [or] specify when th[e] phone call [with Wells] occurred." Id. at 346–47.

We agree with the district court's dismissal of the Fourth Amendment claims against Johnson, Fieger, and Siegal,[7] but reach that conclusion for a different reason. Unlike the district court, we conclude that Sandberg's complaint plausibly alleged that Johnson, Fieger, and Siegal violated the Fourth Amendment by detaining Sandberg even after they dispelled an initial suspicion of workplace violence. However, lacking any case with sufficiently similar facts to warn Johnson, Fieger, and Siegal that their actions violated the Fourth Amendment, we conclude the officers did not violate any clearly established law, and are entitled to qualified immunity.

### i. *Was there a Fourth Amendment violation?*

"In applying the Fourth Amendment's protections against unreasonable searches and seizures, the Supreme Court has recognized three types of police-citizen encounters: consensual encounters, investigative detentions, and arrests." Koch v. City of Del City, 660 F.3d 1228, 1238 (10th Cir. 2011). Since this case involved an investigatory detention, our inquiry requires us to address two questions. See Lundstrom v. Romero, 616 F.3d 1108, 1120 (10th Cir. 2010). First, we must determine "whether the officer[s'] action[s were] justified at [their] inception," and

---

[7] Again, unlike the magistrate judge and the district court, we include Siegal in this analysis because when viewing the facts in the light most favorable to Sandberg, we assume Siegal was present for all relevant acts.

11

grounded in reasonable suspicion. Terry, 392 U.S. at 20; see also Lundstrom, 616

F.3d at 1120.[8] In analyzing reasonable suspicion, "[t]he court views the totality of

the circumstances to see whether the detaining officer had a particularized and

objective basis for suspecting legal wrongdoing." Cortez v. McCauley, 478 F.3d

1108, 1123 (10th Cir. 2007) (en banc) (quotation omitted).

If the initial stop was justified, then we move to the second question and

address whether the investigatory detention continued "'longer than [was] necessary

to effectuate' the purpose of either dispelling or confirming the officer's reasonable

suspicion." United States v. White, 584 F.3d 935, 953 (10th Cir. 2009) (quoting

Florida v. Royer, 460 U.S. 491, 500 (1983)); see also Lundstrom, 616 F.3d at 1120.

In this analysis, we look at whether the officers' actions were "reasonably related in

scope to the circumstances that first justified the interference." Lundstrom, 616 F.3d

at 1120 (quoting United States v. Cervine, 347 F.3d 865, 868 (10th Cir. 2003)). But

"[o]nce reasonable suspicion has been dispelled, '[e]ven a very brief extension of the

detention without consent or reasonable suspicion violates the Fourth Amendment.'"

United States v. De La Cruz, 703 F.3d 1193, 1197 (10th Cir. 2013) (second alteration

in original) (quoting United States v. Burleson, 657 F.3d 1040, 1045 (10th Cir.

2011)); see also Lundstrom, 616 F.3d at 1120–21.

Here, the initial stop and investigatory detention of Sandberg by Johnson,

Fieger, and Siegal was proper. Wells' 911 call about potential workplace violence

---

[8] As this is a civil case under 42 U.S.C. § 1983, whenever we cite to a criminal case in this analysis we provide a civil case that stands for the same proposition.

provided the "particularized and objective basis" for stopping Sandberg, removing

his weapon, and detaining him during an investigation. See Lundstrom, 616 F.3d at

1120. Viewed in the totality of the circumstances, by detaining Sandberg—who was

openly carrying a firearm and may have recently committed a violent offense—the

officers ensured public safety and prevented Sandberg from fleeing. Thus, the initial

stop and investigatory detention of Sandberg comported with Terry.

Yet, when Johnson, Fieger, and Siegal continued to detain Sandberg—despite

lacking reasonable suspicion of workplace violence—they violated Sandberg's

Fourth Amendment rights.[9] As the district court noted, it is not clear from the

complaint exactly when within the four-hour detention Johnson spoke with Wells.

But it is clear that after Johnson spoke with Wells the officers realized Sandberg had

not been involved in workplace violence. Nonetheless, Johnson, Fieger, and Siegal

continued to detain Sandberg while Johnson made multiple phone calls to determine

whether any alternative charges applied. Since the investigatory detention was only

permissible to the extent the officers were looking into Sandberg's involvement in

workplace violence, "even a brief extension of the detention without consent or

reasonable suspicion" after the officers eliminated the suspicion of workplace

---

[9] In reaching this conclusion, we assume that at the conclusion of the phone call with Wells, Johnson, Fieger, and Siegal had no alternative basis for reasonable suspicion of criminal activity. Though the officers later charged Sandberg with disorderly conduct, the complaint does not make clear whether the officers' developed their reasonable suspicion of disorderly conduct before or after Johnson's phone call with Wells. Viewing the facts in the light most favorable to Sandberg, we assume the basis for the disorderly conduct charge occurred *after* Johnson's phone call with Wells.

13

violence was a Fourth Amendment violation.  De La Cruz, 703 F.3d at 1197 (quoting Burleson, 657 F.3d at 1045); see also Lundstrom, 616 F.3d at 1120–21.

### ii. Was that violation clearly established?

Though Sandberg's prolonged detention plausibly alleges a Fourth Amendment violation, Sandberg still must show the violation was clearly established to overcome a qualified immunity defense from Johnson, Fieger, and Siegal.  We conclude Sandberg has not met this burden.

Of the cases that Sandberg cites, Cortez v. McCauley, 478 F.3d 1108 (10th Cir. 2007) (en banc) provides the best support.  In Cortez, a hospital nurse called 911 and repeated an allegation that the husband of a 2-year-old girl's babysitter had sexually assaulted the girl.  Id. at 1112–13.  Police officers went to the babysitters' home around 1 a.m., handcuffed the husband when he answered the door, and entered the home to apprehend the babysitter and then held her in a police car for an hour. Id.  We held the police violated clearly established law in apprehending and detaining both the babysitter and her husband.  Id. at 1122–23.  As to the babysitter, we noted the officers held her pursuant to an investigatory detention, but that this was improper because the information the officers had at the time did not allege any "wrongdoing whatsoever as to" the babysitter.  Id. at 1123.

On one hand, Cortez is factually similar to the instant case because the officers detained the babysitter despite lacking support for wrongdoing on her part and Johnson, Fieger, and Siegal detained Sandberg after discovering he had not been involved in workplace violence.  On the other hand, Cortez is factually distinct

14

because the officers there lacked reasonable suspicion *from the outset* to detain the babysitter.  By contrast, Johnson, Fieger, and Siegal initially had reasonable suspicion that Sandberg was involved in some type of workplace violence.  Because "clearly established law must be 'particularized' to the facts of the case," Pauly, 137 S. Ct. at 552 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)), the factual dissimilarities between Cortez and the instant case mean Cortez cannot provide the clearly established law.

In addition to Cortez, Sandberg primarily relies upon cases that either focus on probable cause to make an arrest[10] or cases analyzing whether officers had reasonable suspicion to initiate an investigatory detention.  For instance, Sandberg cites to United States v. King, 990 F.2d 1152 (10th Cir. 1993).  King was a criminal case addressing whether an officer's tactics in initiating a detention were more intrusive than necessary.  Id. at 1563.  King only addressed whether there was reasonable suspicion to support the initial detention, and not the subsequent question of whether

---

[10] Sandberg relies on six cases that either exclusively or primarily focus on probable cause to make an arrest.  Aplt. Reply Br. at 20–24 (citing United States v. Watson, 423 U.S. 411 (1976) (only addressing probable cause to make an arrest, and not discussing reasonable suspicion for an investigatory stop); Koch v. City of Del City, 660 F.3d 1228, 1239 (10th Cir. 2011) (same); United States v. Valenzuela, 365 F.3d 892, 896 (10th Cir. 2004) (same); Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir. 2002) (same); DeLoach v. Bevers, 922 F.2d 618, 622–23 (10th Cir. 1990) (same)); see also id. at 22 (citing United States v. Treto-Haro, 287 F.3d 1000, 1004–06 (10th Cir. 2002) (concluding officers initially had reasonable suspicion for an initial investigatory detention, and later determining the officers had probable cause for an arrest)).

15

the detention continued after the officers no longer had reasonable suspicion. Therefore, King is not factually similar to the instant case.

Further, United States v. Place, 462 U.S. 696 (1983), is also distinguishable. Place was a criminal case in which officers held a traveler at an airport for 90 minutes before searching his luggage and discovering narcotics. The Court in Place held that "the 90-minute detention of [Place's] luggage [was] sufficient to render the seizure unreasonable," id. at 710, but this was only because the time between the initial detention and the investigatory search was unreasonably prolonged. It is not analogous to the instant case, in which Johnson and Fieger conducted a prompt investigation into Wells' 911 call, but continued to hold Sandberg even after dispelling that initial suspicion. To be analogous to the facts before us, the officers in Place would have had to continue to hold Place for some period after searching his luggage and *not* discovering narcotics.[11]

Though Sandberg does not rely upon it in his briefing, the district court cited United States v. White, 584 F.3d 935 (10th Cir. 2009), for the proposition that a detention that is "longer than necessary to effectuate the purpose of either dispelling or confirming the officer's reasonable suspicion" is unconstitutional. App. at 346

---

[11] To the extent Sandberg relies upon Florida v. Royer, 460 U.S. 491, 500 (1983), Royer is distinguishable for the same reasons as Place. Royer also involved a search of suitcases at an airport. And like Place, the officers eventually found drugs inside the suitcases in Royer. Though Royer held that the consent to search was invalid because of an unlawful detention, the case did not involve officers continuing to detain a suspect even after dispelling their particularized reasonable suspicion of criminal activity.

16

(citing White, 584 F.3d at 953). But White is not factually similar to the instant case. White was a criminal case in which an officer stopped a motorist on Interstate 70, suspected narcotics were in the vehicle, and directed the motorist to drive to a parking lot eight miles away so that a drug dog could be deployed. 584 F.3d at 953–56. We determined the officer's actions were "reasonably related in scope" to the initial suspicion of narcotics possession, and held that there was no Fourth Amendment violation. Id. at 954. Thus, like King and Place, White only involved officers acting upon their initial reasonable suspicion; White did not involve officers dispelling that initial suspicion and continuing to hold a suspect.

Therefore, because no case law has been identified that would have alerted Johnson, Fieger, and Siegal that their actions violated the Fourth Amendment, these officers did not violate clearly established law, and they are entitled to qualified immunity on Sandberg's Fourth Amendment claim.

### b. Contos

Sandberg also alleges Contos violated the Fourth Amendment. Yet, "[i]ndividual liability under § 1983 must be based on personal involvement in the alleged constitutional violation." Foote v. Spiegel, 118 F.3d 1416, 1423 (10th Cir. 1997) (noting an officer could not be liable for any Fourth Amendment violations that occurred before he arrived at the scene). Contos was only at the auto shop for a brief period during Sandberg's initial investigatory detention and before Johnson completed the phone call with Wells. In fact, Contos participated in that initial

17

investigation by speaking with the auto shop proprietor to determine whether Sandberg had exhibited threatening behavior inside the shop.

Importantly, the complaint states that Contos left the scene before Johnson learned that Wells' concern regarding workplace violence was without support. Therefore, Contos had no personal involvement with an unconstitutional detention, and he is entitled to qualified immunity on the Fourth Amendment claim.

### c. Scheider

Next, we must address whether Scheider violated Sandberg's Fourth Amendment rights. In addressing this matter, we exercise our discretion to go directly to the question of whether the law was clearly established, see Pearson, 555 U.S. at 236, and conclude Scheider did not violate any clearly established law.

Because Scheider allegedly violated the Fourth Amendment by recommending that Johnson, Fieger, and Siegal continue to detain Sandberg even after their initial reasonable suspicion was extinguished, Sandberg needed to cite clearly established law to the effect that such a direction to a subordinate violates the Fourth Amendment. He has cited no such case.

Instead, Sandberg directs us to out-of-circuit cases involving police officer nonfeasance—i.e., officers who were aware of a potential constitutional violation, yet declined to intervene. All of these cases are distinguishable from this case of alleged

18

malfeasance.[12] To the extent that Sandberg cites any cases from this court, the cases are either factually distinct, Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012) (arresting officers could be liable for the subsequent unconstitutional detention by other officers), or inapplicable, Hall v. Burke, 12 F. App'x 856, 862 (10th Cir. 2001) (holding that we lacked jurisdiction over the appeal under Johnson v. Jones, 515 U.S. 304 (1995)).

Therefore, Sandberg has not carried his burden of plausibly alleging that Scheider violated clearly established Fourth Amendment law. Scheider is entitled to qualified immunity on this claim.

### 2. Second Amendment

Sandberg next alleges that all Defendants violated the Second Amendment by detaining him, searching him, and issuing him a citation, solely because he was openly carrying a firearm. In analyzing this Second Amendment question, the district court went directly to the clearly established prong of qualified immunity and

---

[12] All of Sandberg's out-of-circuit cases are factually distinguishable from the instant case. O'Neill v. Krzeminski, 839 F.2d 9, 11 (2d Cir. 1988) ("law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers."); Byrd v. Clark, 783 F.2d 1002, 1007 (11th Cir. 1986) ("an unprovoked beating takes place in his presence"); Webb v. Hiykel, 713 F.2d 405, 408 (8th Cir. 1983) (defendant officer accompanied a suspect throughout the jail, and may not have beaten the suspect, but "was nonetheless under a duty to prevent the use of such force, even if the officers beating [the suspect] were his superiors"); Gagnon v. Ball, 696 F.2d 17, 21 (2d Cir. 1982) ("Officer Laplaca not only declined to intercede on Mrs. Gagnon's behalf but also assisted Officer Ball in detaining her"); Bruner v. Dunaway, 684 F.2d 422, 426 (6th Cir. 1982) (officers did not intervene as fellow officer struck suspect); Byrd v. Brishke, 466 F.2d 6, 11 (7th Cir. 1972) (holding that "nonfeasor" officers who were present could be liable for failing to intervene).

19

concluded there was "no settled legal principle regarding an individual's right to openly carry a firearm in public." App. at 341. We also go directly to the clearly established prong, see Pearson, 555 U.S. at 236 (permitting courts to "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first"), and come to the same conclusion.

Under the Supreme Court's decision in District of Columbia v. Heller, 554 U.S. 570 (2008), there is "no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms," id. at 595—at least "in the home operable for the purpose of immediate self-defense," id. at 635. But there are limits on the Second Amendment. Id. at 595. That is, the Second Amendment is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." Id. at 626.

There is no case from the Tenth Circuit or the Supreme Court holding that Heller's articulation of a right to keep and bear arms inside the home must necessarily extend to a right to keep and bear arms outside the home. If anything, we have indicated the Second Amendment has some limitations when applied to conduct outside the home. See Bonidy v. United States Postal Serv., 790 F.3d 1121, 1125 (10th Cir. 2015) (holding a federal regulation prohibiting firearms in federal buildings is constitutional); Peterson v. Martinez, 707 F.3d 1197, 1209 (10th Cir. 2013) (holding the Second Amendment does not guarantee the right to carry a concealed firearm in public).

20

In response to the paucity of authority on point from this court or the Supreme Court, Sandberg directs us to Justice Thomas's dissent from the denial of certiorari in Peruta v. California, 137 S. Ct. 1995 (2017). In Peruta, a litigant asked the Court to address whether a local municipality may place restrictions on firearm possession, such as requiring a particularized reason for a concealed carry permit. The Court declined to hear the case. Id. at 1996. Justice Thomas and Justice Gorsuch dissented, with Justice Thomas writing that he believes "[t]he most natural reading of [the Second Amendment] encompasses public carry." Id. at 1998 (Thomas, J., dissenting).

Yet, a dissent from a denial of certiorari is not binding authority that would create clearly established law. Further, the dissent in Peruta was issued more than three years after the events of this case. Therefore, the dissent in Peruta does not clearly establish that as of May 14, 2014, a citizen had an absolute right to openly carry a firearm in public.

Without a Supreme Court or Tenth Circuit case on point, Sandberg relies upon the Seventh Circuit's opinion in Moore v. Madigan, 702 F.3d 933 (7th Cir. 2012). In Moore, two separate plaintiffs sought declaratory and injunctive relief against the application of an Illinois statute that prohibited the carrying of a firearm in many public places. Id. at 934. Relying on its interpretation of Heller and McDonald v. City of Chicago, 561 U.S. 742 (2010), the Seventh Circuit held that "[t]he Supreme Court has decided that the [Second A]mendment confers a right to bear arms for self-

21

defense, which is as important outside the home as inside," because the Second Amendment is focused on "promot[ing] self-defense." Moore, 702 F.3d at 942.

Of the cases Sandberg cites, Moore is the only circuit court opinion to hold that the Second Amendment guarantees a citizen the right to carry a firearm in public. Other circuits have stated the same principle in dicta, but have not articulated the rule in a holding. See Woollard v. Gallagher, 712 F.3d 865, 876 (4th Cir. 2013) ("[W]e merely assume that the Heller right exists outside the home and that such right of Appellee Woollard has been infringed."); Drake v. Filko, 724 F.3d 426, 431 (3d Cir. 2013) (noting "the Second Amendment's individual right to bear arms *may* have some application beyond the home" but "declin[ing] to definitively declare that the individual right to bear arms for the purpose of self-defense extends beyond the home"); Kachalsky v. Cty. of Westchester, 701 F.3d 81, 89 (2d Cir. 2012) (making an "assumption" that the Second "Amendment must have *some* application in the very different context of the public possession of firearms").

We conclude that Moore does not provide a "clearly established weight of authority from other courts." Patel, 849 F.3d at 980. That one other circuit has issued an opinion which would support Sandberg's claim does not in itself create a clearly established weight of authority. See Panagoulakos v. Yazzie, 741 F.3d 1126, 1131 (10th Cir. 2013). Instead, this court generally looks to whether a "majority of courts" have adopted the rule in question, thereby making it "sufficiently clear that a reasonable officer" would understand the rule and be expected to apply it. Id. Thus, when the events at issue in this case occurred it was not clearly established that the

22

Second Amendment guaranteed a citizen the right to openly carry a firearm in public without risk of facing police action. The district court did not err in dismissing Sandberg's Second Amendment claim.

### 3. First Amendment

Finally, Sandberg alleges that Johnson and Fieger violated the First Amendment when they did not allow Sandberg to film them as they apprehended him. The district court held that Johnson and Fieger were entitled to qualified immunity on this claim because—beginning, again, with the clearly established prong—the district court concluded that it was not clearly established that police officers violate the First Amendment when they prevent a person who is subject to police action from filming police activities. We agree.

Sandberg does not cite to any Tenth Circuit or Supreme Court case addressing whether a person who is the subject of the police action has a First Amendment right to record police activities. Rather, as with his Second Amendment argument, he urges us to look to an alleged "clearly established weight of authority from other courts [that] found the law to be as the plaintiff maintains." Patel, 849 F.3d at 980 (quotation omitted). It is true that the First, Third, Fifth, Seventh, Ninth, and Eleventh Circuits have all held that "the First Amendment protects the act of photographing, filming, or otherwise recording police officers conducting their official duties in public." Fields v. City of Phila., 862 F.3d 353, 355–56 (3d Cir. 2017) (citing Turner v. Lieutenant Driver, 848 F.3d 678 (5th Cir. 2017); ACLU of Ill. v. Alvarez, 679 F.3d 583 (7th Cir. 2012); Glik v. Cunniffe, 655 F.3d 78 (1st Cir.

23

2011); Smith v. City of Cumming, 212 F.3d 1332 (11th Cir. 2000); Fordyce v. City of Seattle, 55 F.3d 436 (9th Cir. 1995)).

Yet, these cases do not provide Sandberg with a clearly established weight of authority for two reasons. First, some of them post-dated the May 14, 2014 events in this case. See Fields, 862 F.3d 353 (decided in 2017); Turner, 848 F.3d 678 (same). Second, the cases are factually distinguishable. All of the cases Sandberg cites only involve a bystander or third party recording the police, and do not involve the person who is the subject of the police action. See, e.g., Glik, 655 F.3d at 79 (plaintiff filmed police as they arrested another man). Sandberg does not point to a case in which the videographer was also the subject of the police action. As such, it was not clearly established that officers violate the First Amendment when they prevent a person who is the subject of the police action from filming the police. The district court correctly granted Johnson and Fieger qualified immunity on Sandberg's First Amendment claim.

## C. Municipal liability

In Claim Six of his complaint, Sandberg alleges the City of Englewood is liable for "an informal custom and widespread practice" that allegedly lead to violations of the First, Second, and Fourth Amendments. App. at 13–14. Though Sandberg could theoretically prove municipal liability by pointing to (1) a written policy, (2) an established custom or practice, or (3) a directive from a person with policymaking authority, his municipal liability claim fails because his complaint did not include any such allegation.

24

"A municipality may not be held liable under 42 U.S.C. § 1983 simply because it employs a person who violated a plaintiff's federally protected rights." Jenkins v. Wood, 81 F.3d 988, 993 (10th Cir. 1996). "To establish municipal liability, a plaintiff must show (1) the existence of a municipal custom or policy and (2) a direct causal link between the custom or policy and the violation alleged." Id.; see also Pyle v. Woods, 874 F.3d 1257, 1266 (10th Cir. 2017). To the extent Sandberg is attempting to prove a custom or policy by the Defendants' failure to act, he must plausibly allege there is a pattern of deliberate indifference to situations like his. Jenkins, 81 F.3d at 994. "More specifically, if the inaction theory rests on an alleged failure to train, the plaintiff must prove the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need for additional training." Id. (internal quotation omitted).

Normally, a "single incident" of unconstitutional behavior "is not sufficient to impose [municipal] liability." Butler v. City of Norman, 992 F.2d 1053, 1055 (10th Cir. 1993). In the rare situation in which a single incident is sufficient to establish liability, it is because the officer who acted unconstitutionally did so "pursuant to a decision made by a person with authority to make policy decisions on behalf of the entity being sued." Jenkins, 81 F.3d at 994; see also Butler, 992 F.2d at 1055.

Here, despite claiming to "specifically allege" the policy or custom that Englewood and its officials had in place, Aplt. Br. at 49, Sandberg's complaint never

25

sets out the text of any Englewood policy. Nor does the complaint describe any prior incidents that would have established a pattern or practice on the part of the city that could cause us to view subsequent inaction as evidence of a policy of deliberate indifference. See Kramer v. Wasatch Cty. Sheriff's Office, 743 F.3d 726, 759–60 (10th Cir. 2014) (concluding there was no prior evidence to alert the municipality that a sergeant was sexually assaulting his subordinates). Thus, Sandberg's complaint does not identify a custom or policy that the officers allegedly applied.

Nor does the complaint state a plausible claim that Comer, the City Attorney, or Scheider, a police sergeant, were policymakers for the Englewood Police Department. The complaint merely alleges Comer and Scheider "were the employees with the final policymaking and supervisory authority." App. at 13. It does not identify the source of the City Attorney's alleged authority to tell the police how they should conduct their investigations. And the complaint does not describe how a police sergeant would have this sort of policymaking authority, to the exclusion of his superior, the Englewood Chief of Police. All told, the complaint's assertion that Comer and Scheider were policymakers is "the type of formulaic recitation of the elements of a cause of action that is insufficient to meet the Twombly pleading standard." Pyle, 874 F.3d at 1266 (internal quotation omitted).

Therefore, we conclude the district court did not err in dismissing Sandberg's municipal liability claim.

### D. Colorado Constitution claim

Sandberg's complaint also includes a claim that the Defendants violated Article II, Section 13 of the Colorado Constitution, which states in relevant part:

> The right of no person to keep and bear arms in defense of his home, person and property, or in aid of the civil power when thereto legally summoned, shall be called in question; but nothing herein contained shall be construed to justify the practice of carrying concealed weapons.

Colo. Const. art. II, § 13.

While a plaintiff may bring an action in federal court under § 1983 for violations of the United States Constitution and the laws of the United States, Colorado does not have a statutory cause of action to address violations of the Colorado Constitution. Further, "where other adequate remedies exist" the Colorado Supreme Court has held that there is "no implied remedy" for a violation of the Colorado Constitution. Board of Cty. Comm'rs of Douglas Cty. v. Sundheim, 926 P.2d 545, 553 (Colo. 1996).

As the district court noted, Sandberg can only pursue a claim for a violation of Colo. Const. art. II, § 13 if that provision is distinct from the Second Amendment. See Arndt v. Koby, 309 F.3d 1247, 1255 (10th Cir. 2002) (holding plaintiff could not pursue a claim for a violation of the Colorado Constitution's free speech provision, since the First Amendment covered the same conduct and she could seek relief under § 1983 for a First Amendment violation). That means that before addressing this Colorado constitutional claim, we would have to determine whether Colo. Const. art. II, § 13 is coextensive with the Second Amendment.

Yet, we need not reach this question. Our conclusion that the district court correctly dismissed Sandberg's § 1983 claims removes any basis for federal jurisdiction in this case. Since the district court only had supplemental jurisdiction over the Colorado Constitution claim, see United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966); see also 28 U.S.C. § 1367(c)(3), the dismissal of all federal causes of action means "the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988).

As we have done before in similar situations, see Bauchman for Bauchman v. W. High Sch., 132 F.3d 542, 549–50 (10th Cir. 1997), we conclude the district court erred by exercising jurisdiction over the state law claims after it had dismissed the federal causes of action. We reverse and remand the Colorado Constitution claim to the district court with instructions to dismiss without prejudice for lack of federal jurisdiction.

**III**

We therefore AFFIRM the district court with respect to its dismissal of Sandberg's § 1983 claims, and REVERSE AND REMAND the Colorado Constitutional claim to the district court with instructions to dismiss the claim without prejudice.

Entered for the Court

Mary Beck Briscoe
Circuit Judge